**Robert W. KELLY et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF CITY OF NASHVILLE et al., Defendants.**

**Civ. A. No. 2094.**

United States District Court.
M. D. Tennessee,
Nashville Division.

Feb. 18, 1958.

---

1. Inconvenience of counsel and expert witnesses are entitled to little or no consideration.

out discrimination on account of race and for an injunction restraining such discrimination. Named as defendants were the members of the Board of Education and the Superintendent of Schools of the city, in addition to principals of particular public schools. Additional parties were added by amendment to the complaint but without changing the nature of the cause of action or of the relief sought.

By their answer to the complaint the defendants conceded, in view of the decisions of the Supreme Court, the unenforceability of the school segregation laws of Tennessee and acknowledged their eventual obligation to operate the schools of the City of Nashville in compliance with the constitutional principles therein declared. However, the position was taken that the defendants should be allowed time to solve various administrative problems and that the transition to a racially non-discriminatory system should not be accomplished immediately but on a gradual basis.

Pursuant to the prayer of the complaint, a three-judge District Court was convened and upon a hearing at the March 1956 term, that Court granted the defendants' motion for a continuance of the case to the October 1956 term. In granting the continuance the Court specifically noted that the Board of Education at an early date had announced that it would comply with the ruling of the Supreme Court in integrating the public schools of Nashville, that it had proceeded promptly to take steps toward that end, and that it was acting in good faith and with appropriate dispatch in awaiting the taking of the school census and giving careful consideration to all factors involved, so as to arrive at a workable plan of integration, "which appears to be a reasonable start toward full compliance with the May 17, 1954 ruling of the Supreme Court". In view of the defendants' concession that Tennessee's school segregation laws were invalid, the three-judge court was dissolved and the case remanded to a single judge court. 1 Race Rel.L.Rep. 519 (1956), 139 F.Supp. 578.

Thurgood Marshall, New York City, Z. Alexander Looby and Avon Williams, Nashville, Tenn., for plaintiff.

Edwin F. Hunt and Reber Boult, Nashville, Tenn., for defendant School Board.

Thomas P. Gore and Sims Crownover, Nashville, Tenn., for School Preference Committee, amici curiæ.

George McCanless, Atty. Gen., State of Tennessee, Allison B. Humphreys, Sol. Gen., State of Tennessee, amici curiæ.

WILLIAM E. MILLER, District Judge.

The complaint was filed September 23, 1955, as a class action, by Negro children eligible to attend the public schools of Nashville, Tennessee, by their parents as next friends, to have declared their rights to attend the public schools with-

At the October 1956 term the Board of Education submitted a plan of desegregation, providing for the elimination of compulsory segregation in the first grade beginning with the 1957–1958 school year, for a voluntary right of transfer on the basis of the racial composition of the school attended, and directing its Instruction Committee to make further studies and to recommend by December 31, 1957, "the time of and the number of grades to be included in the next step to be taken in the further abolishing of compulsory segregation". After a full hearing upon the plan the Court on January 21, 1957, by a memorandum opinion, approved the plan in part as constituting a prompt and reasonable start toward complete desegregation but directed the Board to submit not later than December 31, 1957, "a report setting forth a complete plan to abolish segregation in all of the remaining grades of the city school system, including a time schedule therefor". 2 Race Rel.L.Rep. 21 (1957).

On January 9, 1957, the Governor of Tennessee appeared before a joint session of the General Assembly to propose five bills permitting local authorities to act with respect to questions of racial integration in the public schools. On January 25, 1957, the bills were finally approved by the General Assembly and, as enacted, included: (1) legislation authorizing the establishment of separate schools for pupils whose parents or guardians voluntarily elect that they attend schools only with members of their own race, generally referred to as the School Preference Law, (2) a Pupil Assignment Act to provide for the assignment of pupils to public schools by county or city boards of education, (3) an amendment to the present law authorizing the transfer of pupils between school systems, (4) authorization for the joint operation of school facilities, and (5) an amendatory bill dealing with transportation of pupils. Pub.Acts 1957, cc. 9–13. 2 Race Rel.L.Rep. 215 (1957).

Shortly before the beginning of the 1957–1958 school year, the Board of Education, acting in response to a petition which had been filed with it by a citizens committee, filed a motion with the Court requesting permission to file a supplemental answer and counterclaim to ascertain its authority under and the validity of the School Preference Law, Chapter 11 of the Public Acts of 1957, authorizing Boards of Education of cities and counties to provide separate schools for white and Negro children whose parents, legal custodians or guardians voluntarily elect that such children attend school with members of their own race. On September 6, 1957, after a hearing, the Court held that the School Preference Law was on its face antagonistic to the principles declared by the Supreme Court in the two Brown cases and, therefore, unconstitutional. 2 Race Rel.L.Rep. 970 (1957). Accordingly, an order was entered denying the motion for leave to file the supplemental answer and counterclaim.

The Board of Education on December 6, 1957, filed its report, setting forth what is described as "a complete plan to abolish segregation in all grades of the City School System", in compliance with the prior order of the Court requiring it to submit such a plan not later than December 31, 1957. The plaintiffs have filed objections to the plan, principally upon the ground that it does not comply with constitutional requirements, and one question presently before the Court is whether the plan should be approved.

Before discussing that question, however, it is necessary to consider a motion of the defendants, filed on January 20, 1958, to dismiss the action, such motion, the objections to the School Board's plan for desegregation, and all related questions having been heard by the Court on January 28, 1958. The issues have been fully briefed and orally argued by the parties to the action, and in addition the Court has had the benefit of elaborate briefs submitted as amicus curiae by at-

torneys for the School Preference Committee, a local group sponsoring and supporting the proposed plan, and on behalf of the Attorney General of the State as amicus curiae.

■ The motion to dismiss the action is based upon the provisions of the Pupil Assignment Act, referred to above, Chapter 13 of the Tennessee Public Acts of 1957. It is argued on behalf of the Board of Education that the Act provides the plaintiffs with an adequate administrative remedy to obtain admission or transfer to particular schools and that they should be required to exhaust such remedy before resorting to a court for relief, particularly before resorting to a Federal Court for an injunction. In support of this argument, it is insisted that this Court has already declared the rights of the plaintiffs and others similarly situated to attend the public schools of Nashville without discrimination on account of race and that it is, therefore, not necessary for the Court longer to retain jurisdiction since the only remaining problem is the assignment of individual students to particular schools, a matter now governed by the Pupil Assignment Act. To support its contention as to the validity of the Pupil Assignment Act, the Board of Education relies upon Carson v. Board of Education of McDowell County, 4 Cir., 227 F.2d 789, and Carson v. Warlick, 4 Cir., 238 F.2d 724, certiorari denied 353 U.S. 910, 77 S.Ct. 665, 1 L.Ed. 664, in which the Fourth Circuit Court of Appeals held that the North Carolina Pupil Enrollment Act Laws 1955, c. 366, was not unconstitutional on its face, and that Negro children denied admission to schools would first be required to exhaust the administrative remedies provided for by the Act before being entitled to declaratory or injunctive relief in a Federal Court with respect to their right to attend school. The standards provided for in the North Carolina Act required that the enrollment be made "so as to provide for the orderly and efficient administration of such public schools, the effective instruction of the pupils therein enrolled, and

the health, safety, and general welfare of such pupils". The Act further provided for application to and prompt hearing by the Board in the case of any child whose admission to any public school within the county or city had been denied, with right of appeal from an adverse ruling to the courts.

However, notwithstanding the apparent scope and generality of the rulings of the Fourth Circuit in the two cases just cited, the Court is unable to reach the conclusion on the facts of the instant case that the action should be dismissed and the plaintiffs remitted to a so-called administrative remedy, with the implied invitation to return to the Federal Court if that remedy is exhausted without obtaining satisfactory results. This is true because the Court is of the opinion that the administrative remedy under the Act in question would not be an adequate remedy. In this connection, it must be recalled that the relief sought by the complaint is not merely to obtain assignment to particular schools but in addition to have a system of compulsory segregation declared unconstitutional and an injunction granted restraining the Board of Education and other school authorities from continuing the practice and custom of maintaining and operating the schools of the city upon a racially discriminatory basis. While it is true that by its order entered pursuant to its memorandum of January 21, 1957, this Court "recognized and declared" the rights of the plaintiffs and others similarly situated to attend the public schools of the City of Nashville without discrimination on account of race, it was specifically provided that "the issuance of an injunction is withheld pending the filing of a report" with respect to complete desegregation and the action of the Court upon any objections thereto. By the same order jurisdiction of the action was retained "during the period of transition". The effect of the order was therefore not to direct the immediate discontinuance of the practice of compulsory segregation in the public schools, but on the contrary, to permit its con-

tinuance during a gradual period of transition in keeping with what the Court believed was the true meaning of the second Brown opinion of the Supreme Court. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. Thus the argument of defendants that the case is now moot is not supported by the record, for the primary purpose of the complaint to end racial discrimination in the public school system has not been accomplished.

Clearly the principal reason why the administrative remedy under the Act is inadequate is that the administrative agency would be in the instant case, the Board of Education of the City of Nashville. That agency, according to the record in this case, has never abandoned a policy of compulsory segregation in the public schools, other than in the first grade as provided for by its plan which was heretofore approved in part by the Court. To require the plaintiffs to go before a board committed in advance to a continuance of compulsory segregation would be to require them to perform a futile act or to pursue a remedy which would have no reasonable prospect of success.

That the Board of Education is in fact committed ·to such a policy is the inescapable conclusion from the position which it has consistently taken from the outset of the litigation. In its first application to the Court for a continuance, the Board insisted that it should be allowed to effect a transition to a racially non-discriminatory system on a gradual basis, and it therefore requested a continuance of the case to permit it to make a further study and to formulate a workable plan of integration. The first plan submitted proposed to abolish compulsory segregation in the first grade only and to refer the problem of further integration to its Instruction Committee for additional study and a later recommendation. Its next appeal to the Court was to have its rights declared under the Tennessee School Preference Law which would have allowed the Board to establish and maintain segregated schools in accordance with the wishes of school parents. And finally, the Board has presently before the Court a plan similar to the provisions of the School Preference Law authorizing it to maintain and operate both segregated and integrated schools dependent upon the preferences of school patrons. Notwithstanding the good faith of the Board of Education in its efforts to meet a grave problem, the Court would indeed be "closing its eyes to the obvious" if it should not conclude that the Board is presently committed to compulsory segregation in the public schools other than in grade one. Nor has the Court been given any assurance that this fixed practice and policy of the Board will be discontinued in the future.

The inadequacy of the administrative remedy proposed by the defendants is emphasized when the present segregation policy of the Board of Education is considered in the light of the criteria and factors prescribed by the Pupil Assignment Act to determine pupil assignments. Thus by Section 2 of the Act it is provided that the Board of Education may consider and base its decision on any one or more of a large number of factors, including "the effect of the enrollment on the welfare and best interests of such pupil and all other pupils in said school as well as the effect on the efficiency of the operation of said school"; "the psychological qualifications of the pupil for the type of teaching and associations involved"; "the effect of admission of the pupil upon the academic program of other students in a particular school or facility thereof"; "the psychological effect upon the pupil of attendance at a particular school"; "the effect of any disparity between the physical and mental ages of any pupil to be enrolled, especially when, contrasted with the average physical and mental ages of the group with which the pupil may be placed"; "the sociological, psychological, and like intangible social scientific factors as will prevent, as nearly as possible, a condition of socioeconomic class consciousness among the pupils"; "the possibility or threat of friction or disorder among pupils or

others"; "the possibility of breaches of the peace or ill will or economic retaliation within the community"; "the home environment of the pupil"; "the maintenance or severance of established social and psychological relationships with other pupils and with teachers"; "the choice and interests of the pupil"; "the request or consent of parents or guardians and the reasons assigned therefor"; and "any and all other factors which the board may consider pertinent, relevant or material in their effect upon the welfare and best interest of the applicant, other pupils of the county, city or special school district as a whole and the inhabitants of the county, city or special school district".

Whether or not the Pupil Assignment Act is constitutional (a question which is not decided), at least there can be no doubt that there is nothing in the language of the Act which would preclude a Board of Education from taking into account racial distinctions in making pupil assignments. Nor is there anything in the Act which is in any manner inconsistent with a continued policy of compulsory racial segregation, with the result that the administrative remedy itself would not afford the plaintiffs in the instant case any opportunity or ground upon which to resist the fixed policy of the Board to operate the city's schools on a compulsorily segregated basis.

 It is recognized by the authorities that the necessity of pursuing an administrative remedy provided by state law before seeking injunctive relief in a Federal Court does not apply unless the administrative remedy is "adequate". School Board of City of Newport News, Va. v. Adkins, 4 Cir., 246 F.2d 325; Gibson v. Board of Public Instruction of Dade County, Florida, 5 Cir., 246 F.2d 913. In the Adkins case the Virginia Pupil Placement Act, Acts 1956, Ex. Sess., c. 70, was declared unconstitutional but the Court further found that the statute did not furnish an adequate remedy to the plaintiffs because "of the fixed and definite policy of the school authori-

ties with respect to segregation * * *." [246 F.2d 326.] And in the Gibson case the Court of Appeals for the Fifth Circuit, in holding that the plaintiffs were not required to pursue administrative remedies under the Florida Pupil Assignment Law, F.S.A. § 230.231, stated [246 F.2d 914]:

> "Neither that nor any other law can justify a violation of the Constitution of the United States by the requirement of racial segregation in the public schools. So long as that requirement continues throughout the public school system of Dade County, it would be premature to consider the effect of the Florida laws as to the assignment of pupils to particular schools".

Being of the opinion upon the facts here presented that the suggested administrative remedy is inadequate, and that the case is not moot, the motion of defendants to dismiss the action cannot prevail.

 If the action is not dismissed, the Board then requests approval by the Court of its plan for desegregation filed with its report to the Court on December 6, 1957. The proposed plan is as follows:

"Plan

"1. No compulsory integration or segregation shall be required in any grade of the Nashville Public School System.

"2. There shall be conducted annually a parents preference census to determine which parents desire their children to attend school with members of their own race exclusively and which parents desire that their children attend school with the members of another race. Such preference shall be stated by parents or those standing in the position of parents, and if no preference is indicated the child shall be assigned by the Board under rules in conformity with this plan.

"3. Three groups of schools of equal standards, opportunity and

facilities in accordance with the preferences indicated above shall be established in as nearly accessible and convenient locations as practicable:

"a. Schools for Negro students whose parents prefer that their children attend school with members of their own race exclusively;

"b. Schools for White students whose parents prefer that their children attend school with members of their own race exclusively;

"c. Integrated schools for those students whose parents prefer that their children attend schools available to both Negro and White children.

"4. Requests by parents for transfer of their children from one school to another shall be acted upon by the Board in accordance with existing laws.

"5. All administrative details and procedures for the operation of this plan within the framework thereof shall be determined by the Superintendent of Nashville City Schools under the direction of this Board."

The arguments advanced to support the constitutionality of the plan are practically the same as those advanced and considered by the Court in passing upon the School Preference Law above referred to, inasmuch as there is no real or substantial difference between the plan and the provisions of the Law which the Court found to be unconstitutional on its face at the hearing on September 6, 1957. It is true that the plan, unlike the School Preference Law, specifically provides that an annual census be taken to determine the preferences of school parents, and that the Board is authorized, in addition to separate white and Negro schools, to maintain integrated schools for children whose parents desire that their children attend such schools. However, these provisions were clearly implicit in the School Preference Law itself.

Upon further consideration, the Court finds no reason to alter its view that such a plan wholly fails to meet the test of constitutionality. It would sanction by law, if approved, the separation of schools in accordance with racial distinctions and once the schools were separated, Negro children because of their race alone would be excluded by operation of law from schools designated for white children only. The discrimination would not be removed simply by providing a third school or group of schools which could be attended by members of both the white and colored races. It is a mistaken interpretation of the segregation decisions of the Supreme Court to argue that the doctrine of those cases applies only to an entire school system and not to individual schools. The fundamental basis of the decisions is that members of the Negro or minority race are denied the equal protection of the law if they are denied admission to public schools which they are otherwise qualified to attend solely upon grounds of their race. The discrimination is clearly not eliminated by maintaining and operating some schools in the system on a racially segregated basis and others with the discrimination removed.

Another objectionable feature of the plan is that it does not offer in any realistic sense an alternative or choice to the members of the minority race. To hold out to them the right to attend schools with members of the white race if the members of that race consent is plainly such a dilution of the right itself as to rob it of meaning or substance. The right of Negroes to attend the public schools without discrimination upon the ground of race cannot be made to depend upon the consent of the members of the majority race. That the proposal to establish a group of integrated schools is, as a practical matter, illusory and meaningless is clearly shown by the testimony of the Superintendent of Schools. He stated, in substance, that if the census provided for in the plan should be taken, it would be doubtful that any substantial number of white parents would consent.

to have their children attend school with members of the colored race. In such circumstances, to approve the plan would be in effect to deny to the members of the colored race the protection of the Fourteenth Amendment as construed by the Supreme Court, for they would be remitted solely to schools of their own race.

The case of Briggs v. Elliott, D.C., 132 F.Supp. 776, cannot by any reasonable interpretation be construed as authority for the plan presently proposed. The most that the Elliott case decided was that the Supreme Court decision in the Brown cases did not require integration but merely prohibited segregation on account of race. On any fair appraisal of the plan now under consideration it must be concluded that it would in fact require and give the sanction of the law to a continuation of compulsory segregation in public education.

Despite the sincere and earnest arguments which have been advanced in support of the plan both by attorneys representing the School Board and attorneys representing the School Preference Committee, the Court is unable to find either that it is constitutional or that it is practically feasible and workable. The plan must, therefore, be disapproved.

■ In this posture of the case, the question remains whether an injunction should issue requiring desegregation in all of the remaining grades of the school system beginning with the next school term, or whether an injunction should be withheld pending the submission by the Board of another plan which would offer a workable and legal solution to the problem of accomplishing a transition to a system having no racial discrimination. The first alternative is strongly urged upon the Court by the plaintiffs, with the Board of Education requesting further time to submit another plan.

The Court is mindful of the fact that it has been approximately four years since the Supreme Court first declared invalid racial discrimination in public education, and that the plaintiffs are entitled to have their constitutional rights enforced without undue delay. Nevertheless, the record is replete with evidence that the problem with which the School Board is confronted is one of a grave and complex nature, the solution of which requires not only time but also patience and understanding on the part of the school authorities and on the part of the members of both the white and colored races. The conditions in Nashville must be appraised and assessed primarily by the constituted school authorities. They are certain in their belief that the best interests of the entire school system require that integration not be accomplished in all grades simultaneously but rather in accordance with a gradual step-by-step plan. The Superintendent of Schools so testified at the last hearing and there was similar evidence upon the hearing of the first plan. The Federal Courts cannot operate the public schools and should refrain from any interference with their operation by the regular school authorities unless it is plainly necessary to intervene to protect constitutional rights. Notwithstanding the failure of the Board thus far to submit an acceptable plan, the Court is of the opinion that it should be accorded a further opportunity to study the problem and to present a plan for desegregating the remaining grades of the school system together with a time schedule therefor. However, in view of the history of the litigation as set forth in this opinion, and the delay since the applicable constitutional principles were first announced, it should be apparent that the School Board must adopt a substantial plan and one which contemplates elimination of racial discrimination throughout the school system with all deliberate speed.

An order will be passed to the Court carrying out the terms of this opinion, allowing the School Board until the 7th day of April 1958 to file with the Court another plan, and directing that a hearing be held thereon before this Court for approval or disapproval on the 14th day of April 1958.