Lawrence HALL et al., Plaintiffs,

v.

ST. HELENA PARISH SCHOOL BOARD et al., Defendants.

Civ. A. No. 1068.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Aug. 30, 1961.

---

**650**

Thurgood Marshall, New York City, A. P. Tureaud, A. M. Trudeau, Jr., New Orleans, La., Jack Greenberg, New York City, for plaintiffs.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, L. K. Clement, Jr., Weldon Cousins, Michael E. Culligan, John M. Currier, John E. Jackson, Jr., George Ponder, William P. Schuler, Asst. Attys. Gen., W. Scott Wilkinson, Sp. Asst. Atty. Gen., Duncan Kemp, Dist. Atty. for St. Helena Parish, Amite, La., E. Freeman Leverett, Deputy Atty. Gen. of Georgia, Gordon Madison, Leslie Hall, Deputy Attys. Gen. of Alabama, for defendants.

M. Hepburn Many, U. S. Atty., New Orleans, La., Harold H. Greene, U. S. Dept. of Justice, Washington, D. C., for the United States, amicus curiae.

Before WISDOM, Circuit Judge, and CHRISTENBERRY and WRIGHT, District Judges.

PER CURIAM.

Undeterred by the failure of its prior efforts, the Louisiana Legislature continues to press its fight for racial segregation in the public schools of the state. Today we consider its current segregation legislation, the keystone of which,

the local option law, is under attack in these proceedings.

On May 25, 1960, this court entered its order herein restraining and enjoining the St. Helena Parish School Board and its superintendent from continuing the practice of racial segregation in the public schools under their supervision "after such time as may be necessary to make arrangements for admission of children to such schools on a racially non-discriminatory basis with all deliberate speed." The Court of Appeals affirmed this judgment on February 9, 1961.[1]

On February 9, 1961, the very day of the affirmance of the order of this court,[2] the Governor of the State called the Second Extraordinary Session of the Louisiana Legislature for 1961 into session to act "relative to the education of the school children of the State * * * for the preservation and protection" of state sovereignty. Within a few days of the call, he certified as emergency legislation what became Act 2[3] of that session, the local option law in suit, as well as related legislation designed to continue racial segregation in the public schools, in spite of the desegregation order of this court in this case in particular and desegregation orders in general. As is manifest from the legislative history of the statute and an analysis of its provisions as these are related to cognate legislation, the sub-surface purpose of Act 2 is to provide a means by which public schools under desegregation orders may be changed to "private" schools operated in the same way, in the same buildings, with the same furnishings, with the same money, and under the same supervision as the public schools. In addition, as part of the plan, the school board of the parish where the public schools have been "closed" is charged with responsibility for furnish-

ing free lunches, transportation, and grants-in-aid to the children attending the "private" schools.

The statute in suit violates the equal protection clause on two counts. Most immediately, it is a transparent artifice designed to deny the plaintiffs their declared constitutional right to attend desegregated public schools. More generally, the Act is assailable because its application in one parish, while the state provides public schools elsewhere, would unfairly discriminate against the residents of that parish, irrespective of race.

I.

■ The language of the Supreme Court in Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19 cannot be disregarded: "[T]he constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Id., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083] can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.' Smith v. [State of] Texas, 311 U.S. 128, 132 [61 S.Ct. 164, 166, 85 L.Ed. 84]." These words tell the Louisiana Legislature, as clearly as language can, that school children may not be denied equal protection of the laws, may not be discriminated against in school admissions, on grounds of race or color. The Louisiana Legislature has confected one "evasive scheme" after another in an effort to achieve this end. This court has held these unconstitutional in one decision after another affirmed by the Supreme

---

1. St. Helena Parish School Board v. Hall, 5 Cir., 287 F.2d 376.

2. Orders of this court requiring desegregation of the Baton Rouge public schools and five state trade schools were also affirmed on February 9, 1961. East

Baton Rouge Parish School Board v. Davis, 5 Cir., 287 F.2d 380; Louisiana State Board of Education v. Allen, 5 Cir., 287 F.2d 32; Louisiana State Board of Education v. Angel, 5 Cir., 287 F.2d 33.

3. La.R.S. 17:350.1 et seq.

Court.[4] Yet they continue to be enacted into law.

As with the other segregation statutes, in drafting Act 2 the Legislature was at pains to use language disguising its real purpose. All reference to race is eliminated, so that, to the uninitiated, the statute appears completely innocuous. For example, the first section of Act 2 reads:

"In each parish of the state, and in each municipality having a municipally operated school system, the school board shall have authority to suspend or close, by proper resolution, the operation of the public school system in the elementary and secondary grades in said parish or municipality, but no such resolution shall be adopted by any such board until the question of suspending or closing the operation of such public school system in such grades shall have been submitted to the qualified electors of the parish or municipality, as the case may be, at an election conducted in accordance with the general election laws of the state, and the majority of those voting in said election shall have voted in favor of suspending or closing the operation of such public school system."

On its face, this section appears inoffensive. It is only after an analysis of this school closing measure with other sections of the Act and related legislation that the purpose, mechanics, and effect of the plan emerge.[5]

■ Irrespective of the express terms of a statute, particularly in the area of racial discrimination, courts must determine its purpose as well as its substance and effect. "A result intelligently foreseen and offering the most obvious motive for an act that will bring it about, fairly may be taken to have been a purpose of the act." Miller v. City of Milwaukee, 272 U.S. 713, 715, 47 S.Ct. 280, 71 L.Ed. 487. Moreover, "acts generally lawful may become unlawful when done to accomplish an unlawful end." Western Union Tel. Co. v. Foster, 247 U.S. 105, 114, 38 S.Ct. 438, 439, 62 L.Ed. 1006.[6] The defendants argue that we should not probe for the purpose of this legislation, that we should ignore the events which led up to and accompanied its passage, and determine its validity based on its language. But " * * * we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men." [7]

The sponsors of this legislation, in their public statements, if not in the Act itself, have spelled out its real purpose.[8]

4. See Bush v. Orleans Parish School Board, D.C.E.D.La., 138 F.Supp. 337, affirmed, 5 Cir., 242 F.2d 156; Id., D.C., 163 F.Supp. 701, affirmed 5 Cir., 268 F. 2d 78; Id., D.C., 187 F.Supp. 42, affirmed, 365 U.S. 569, 81 S.Ct. 754, 5 L. Ed.2d 806; Id., D.C., 188 F.Supp. 916, affirmed, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806; Id., D.C., 190 F.Supp. 861, affirmed, 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239; Id., D.C.. 191 F.Supp. 871, affirmed, Denny v. Bush, 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1247, Legislature of La. v. United States, 367 U.S. 908, 81 S.Ct. 1925, 6 L.Ed.2d 1250, Tugwell v. Bush, 367 U.S. 907, 81 S.Ct. 1926, 6 L.Ed.2d 1250; Id., D.C., 194 F. Supp. 182.

5. Act 2, of course, must be read with other legislation *in pari materia.* See 2 Sutherland, Statutory Construction (3rd Ed. 1943), §§ 5201–5202, pp. 529–539. See also cases cited in Note 4.

6. See also Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L. Ed. 660; Gomillion v. Lightfoot, 364 U.S. 339, 347–348, 81 S.Ct. 125, 5 L.Ed.2d 110; Rice v. Elmore, 4 Cir., 165 F.2d 387, 391; Baskin v. Brown, 4 Cir., 174 F.2d 391, 393.

7. Mr. Justice Field, sitting as Circuit Judge, in Ho Ah Kow v. Nunan, Fed.Cas. No.6,546, 5 Sawy. 552, 560.

8. In Louisiana, as in most states, the legislative debates, committee proceedings, and committee reports are not rerecorded officially. Going to the next best records, newspapers, we find in the record of this case a mass of contemporary newspaper articles, filed by the plaintiffs and by amicus curiae, bear-

Administration leaders repeatedly said that the local option bill should not be construed as indicating the state would tolerate even token integration. The law would be used in parishes either having or threatened with desegregation: Orleans, East Baton Rouge and St. Helena. Times-Picayune, February 20, 1961. The program for the legislative session which adopted Act 2 was worked out by the so called "Liaison Committee," a committee charged with co-ordinating the administration's segregation strategy. Times-Picayune, February 11, 1961. Representative Risley Triche, administration floor leader and sponsor of Act 2, told the House of Representatives, "[The bill] does not authorize any school system to operate integrated schools. We haven't changed our position one iota. This bill allows the voters to change to a private segregated school system. That's all that it's intended to do. I don't think we want to fall into the trap of authorizing integrated schools by the votes of the people. This bill doesn't allow that and we're not falling into that trap." Times-Picayune, February 18, 1961. The president pro tem. of the Senate explained the bill as follows: "As I see it, Louisiana is entering into a new phase in its battle to maintain its segregated school system. The keystone to this new phase is the local option plan we have under consideration." [9] Times-Picayune, February 20, 1961. And segregation leader Representative Wellborn Jack

was even more explicit: "It gives the people an opportunity to help fight to keep the schools segregated. We are the ones who have been speaking for segregation. This is going to give the people in all 64 parishes the right to speak by going to the polls. This is just to recruit more people to keep our schools segregated, and we're going to do it in spite of the federal government, the brainwashers and the Communists." Shreveport Times, February 18, 1961. In short, the legislative leaders announced without equivocation that the purpose of the packaged plan was to keep the state in the business of providing public education on a segregated basis.

The legislative scheme here, once revealed, is disarmingly simple. Section 1 [10] of Act 2 provides a means for "closing" the public schools in a parish. Section 13 [11] of the Act provides that the school board may then "lease, sell, or otherwise dispose of, for cash or on terms of credit, any school site, building or facility not used or needed in the operation of any schools within its jurisdiction, on such terms and conditions and for such consideration as the school board shall prescribe." Of course, to the extent that such conveyances, denominated "sales," are for less than the fair value of the property, they are gifts constituting continuing state aid to "private" schools. Presumably, this sale would be made to educational cooperatives, created pursuant to Act 257 of

ing on the legislative history of Act 2 and its related measures. Affidavits from the authors of the articles attest their accuracy. In all instances they are part of the official records. Their reliability is evidenced by their substantial agreement.

9. Representative Salvador Anzelmo, one of the two legislators to vote against Act 2, declared that in actuality local option was a misnomer; it did not give the people an option because if they voted to keep the schools open, those schools which are integrated would be forced to close because state funds would be cut off. Representative Anzelmo said: "They are not going to get any money

if they keep the schools open. We give them no choice. I say this is a bad bill because the intent is to positively kill public education in Louisiana. We will kill the youth of Louisiana, we kill the aspirations and hopes of Louisiana.
"You'll be haunted by that vote the rest of your life, because the poor people of this state will not be able to get an education. In effect, we are giving the people no option whatever. The only thing we are doing is providing the apparatus to close the schools of this state." Shreveport Times, February 18, 1961.

10. La.R.S. 17:350.1.

11. La.R.S. 17:350.13.

1958,[12] which would operate the "private" schools with state money furnished by the grant-in-aid program provided for in Act 3 [13] of the Second Extraordinary Session of 1960.[14]

Under Act 3 of the Second Extraordinary Session of 1960, the parish school boards would continue to supervise the "private" schools, under the State Board of Education, by administering the grant-in-aid program of tuition grants payable from state and local funds. This act is identical with Act 258 of 1958,* which was repealed, except that it omits the earlier explanation that tuition grants are available "where no racially separated public school is provided" and it deletes all other references showing its sub-surface purpose. Financial aid is direct from state to school: tuition checks are to be made out by the state jointly to the parent and the school.[15] Under Section 12 [16] of Act 2 in suit, the state would also have the responsibility of furnishing such "private" school children with school lunches and transportation, the cost of which would be borne by the state. The program is to be administered by the State Board of Education, with the assistance of each local board. In addition, in order to insure tenure for the teachers in the "private" schools, Section 1 of Act 4 [17] of the Second Extraordinary Session of 1961 empowers the educational cooperatives to enter into contracts of employment with teachers for "terms of at least five years, but not more than ten years." And to protect the salaries of the teachers, school bus drivers, school lunch workers, janitors and other school personnel of the "private" schools, Section 2 of the same Act [18] provides that such salaries shall not be "less than or in excess of any minimum salary schedule or law heretofore adopted by the legislature to govern the salaries or wages of any school teachers, school bus drivers, school lunch workers, janitors or any other school personnel." Acts 9 and 10 were enacted

12. La.R.S. 17:2801 et seq.

13. La.R.S. 17:2901 et seq.

14. Act 9 of the Second Extraordinary Session of 1961 transfers $2,500,000 from the Public Welfare Fund to the Education Expense Grant Fund for grant-in-aid use, and Act 10 of the same session (La.R.S. 47:318) transfers $200,000 monthly from the sales tax collections to the same fund for the same purpose.

* Former R.S. 17:391.1 et seq.

15. The large number of Catholic schools in Louisiana presented the legislature with an insoluble problem. If the tuition grants are "benefits to the child," and not state support of the schools, the legislation is discriminatory on its face in excluding children attending church schools. If the grants amount to state support of schools, support of religious institutions is prohibited by the First Amendment—not to speak of the federal constitutional prohibition against state action in supporting segregated schools or the state prohibition against spending public funds for private purposes.
The amount of each grant may equal the per-day, per-student amount of state and local money expended on public schools during the previous year. It is determined by the governing authority of the local school system. The grant application is made to such authority on a form prescribed by the State Board of Education. The grant must be approved by the local authority, but disapproval may be appealed through the Louisiana courts. Payments are to be made jointly to parents and schools, in accordance with regulations prescribed by the State Board of Education. The State Board of Education has general management of the grant funds.
The heavy subsidy private schools would receive suggests the relevance of Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212, certiorari denied 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427. In that case the Court held that a library school, orginally private, was converted into a public instrumentality upon receiving a subsidy amounting to 90 per cent of its costs. Although other factors were involved, the Court said that since the state had supplied the means of economic existence it had supplied the means by which the school was able to discriminate. Fringe benefits such as free lunches are not analogous to tuition grants.

16. La.R.S. 17:350.12.

17. La.R.S. 17:2830.

18. La.R.S. 17:2831.

as emergency legislation on the same day Act 2 became law. Act 9 provides for transfer of funds from the Public Welfare Fund to the Education Expense Grant Fund. Act 10 provides for allocation of sales tax revenues to the Education Fund.

Moreover, to make certain that the "private" schools are not interfered with by persons who would accept desegregated education the Legislature adopted Acts 3[19] and 5[20] of the Second Extraordinary Session of 1961. Act 3 provides mandatory jail sentences and fines for anyone "bribing" parents to send their children to desegregated schools. It rewards informers who report such action with the money collected in fines. Act 5 provides mandatory jail sentences for anyone inducing parents or school employees to violate state law, that is, by "attend[ing] a school in violation of any law of this state." This Act also rewards the informers. The Legislature at the same special session, apparently feeling that the St. Helena Parish School Board as constituted could be trusted to supervise the "private" school program but doubtful about the East Baton Rouge Parish School Board, subject to the same desegregation order as St. Helena, passed Act 7[21] providing for the packing of the East Baton Rouge Parish School Board with appointees of the Governor.

█ This analysis of Act 2 and related legislation makes it clear that when the Legislature integrated Act 2 with its companion measures, especially the "private" school acts, as part of a single carefully constructed design, constitutionally the design was self-defeating. Of necessity, the scheme requires such extensive state control, financial aid, and active participation that in operating the program the state would still be providing public education. The state might not be doing business at the old stand; but the state would be participating as the senior, and not silent, partner in the same sort of business. The continuance of segregation at the state's public-private schools, therefore, is a violation of the equal protection clause. This would be the case in any parish, should the schools be closed under Act 2. At St. Helena the discrimination would be immediate, obvious, and irreparable. See Appendix A. St. Helena is a poor parish. Its schools receive 97.1 per cent of their operating revenues from the state. We draw a fair inference from the record and facts, of which we may take judicial notice, that it would take extraordinary effort for any accreditable private school to operate in St. Helena without substantial funds and participation from the state. It would be a miracle if a single accreditable private school for Negroes could be established in St. Helena within the foreseeable future. To speak of this law as operating equally is to equate equal protection with the equality Anatole France spoke of: "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread."[22]

This scheme of the Louisiana Legislature to deny school children constitutional rights is not new. It has been tried before, with similar results.[23] In declaring such a scheme unconstitutional, the Eighth Circuit, in Aaron v. Cooper, 261 F.2d 97, 106–107, relied heavily on this pronouncement by the Supreme Court: "State support of segregated schools

---

19. La.R.S. 14:119.1.

20. La.R.S. 14:122.1.
   Both Act 3 and Act 5 were declared unconstitutional by this court in Bush v. Orleans Parish School Board, D.C.E.D.La., 194 F.Supp. 182. Since the writing of this opinion, that decision was affirmed by the Supreme Court. See Gremillion v. United States. 82 S.Ct. 119.

21. La.R.S. 17:58.

22. See Griffin v. People of State of Illinois, 351 U.S. 12, 23, 76 S.Ct. 585, 593, 100 L.Ed. 891.

23. "Private" schemes serving to cloak state action violative of the Fifteenth Amendment have also been exposed. See Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Perry v. Cyphers, 5 Cir., 186 F.2d 608; Rice v. Elmore, supra.

through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws." Cooper v. Aaron, supra, 358 U.S. 19, 78 S.Ct. 1410, 3 L.Ed. 2d 5, 19. The ruling here must be the same.

## II.

Act 2 runs afoul the equal protection clause in another respect. Though its immediate purpose is undoubtedly to circumvent the mandate of Brown [24] and our desegregation orders, thereby discriminating specifically against Negro school children, inevitably, another effect of the statute is to discriminate geographically against all students, white and colored, in St. Helena or any other community where the schools are closed under its provisions.

■ Applying familiar principles to the admitted facts, that conclusion seems inescapable. Thus, it is clear enough that, absent a reasonable basis for so classifying, a state cannot close the public schools in one area while, at the same time, it maintains schools elsewhere with public funds.[25] And, since Louisiana here offers no justification for closure in St. Helena Parish alone, and no "state of facts reasonably may be conceived to justify it," except only the unlawful purpose to avoid the effect of an outstanding judgment of the court requiring desegregation of the public schools there, it seems obvious that the present classification is invidious, and therefore unconstitutional, even under the generous test of the economic discrimination cases. See McGowan v. State of Maryland, 366 U.S. 420, 425–428, 81 S.Ct. 1101, 6 L.Ed.2d 393, and cases there cited. But defendants reject this simple and direct approach, alleging that it ignores what they deem controlling differences in the present legislation. Accordingly, we must examine the question at greater length.

To distinguish the other school closure cases, particular stress is laid on the local option feature of the statutory plan. Much is claimed for it. Indeed, conceding that a legislative or gubernatorial directive closing the public schools in only one parish would be constitutionally invalid, defendants nevertheless maintain that there is no denial of equal protection when the same result is achieved through a decision of the local authorities rather than the central state government.[26] The argument has two faces. First, it is said that the state legislature itself is guilty of no discrimination, since its statute treats all communities alike and imposes school closure on none. Then, changing the focus to the local scene, the contention is that when the parish school authorities close *all* their schools, having dealt impartially with everyone within their limited jurisdiction, they cannot be accused of discriminating. And here defendants cite the swimming pool and park cases. See Tonkins v. City of Greensboro, North Carolina, 4 Cir., 276 F.2d 890; City of Montgomery, Alabama v. Gilmore, 5 Cir., 277 F.2d 364.

The St. Helena Parish School Board may not be discriminating geographically when it expends the full measure of its power by closing all schools under its control, but that does not make the rule of Tonkins and Gilmore applicable.

24. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

25. James v. Almond, D.C.E.D.Va., 170 F. Supp. 331, appeal dismissed, 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987; Aaron v. McKinley, D.C.E.D.Ark., 173 F. Supp. 944, affirmed sub nom. Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237; Bush v. Orleans Parish School Board, D.C.E.D.La., 187 F.Supp. 42, affirmed, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806; Id., D.C., 188 F.Supp. 916, affirmed, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806.

26. Defendants of course concede, as they must, that the act of the local school board is "state action" within the scope of the Fourteenth Amendment. See Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510.

Indeed, even if recreation is viewed in the same constitutional light as public education, the rationale of those cases applies only when the facilities sought to be closed are locally owned, financed and administered, and the state itself is not directly concerned in their operation. See City of Montgomery, Alabama v. Gilmore, supra, 277 F.2d 368, note 4. In such case, only local action is involved, and so long as the closure order is general and affects all residents equally, there is no discrimination at any level. But the same principle does not excuse inequalities in a statewide, centrally financed and administered, system of public institutions.[27]

There can be no doubt about the character of education in Louisiana as a state, and not a local, function. The Louisiana public school system is administered on a statewide basis, financed out of funds collected on a statewide basis, under the control and supervision of public officials exercising statewide authority under the Louisiana Constitution and appropriate state legislation. The State Supreme Court has said so emphatically:

" * * * Public education is declared by the constitution to be an affair of the state, and it assumes the whole responsibility of public education. * * *" Nelson v. Mayor, etc., of Town of Homer, 48 La.Ann. 258, 19 So. 271.

Again in Hill v. DeSoto Parish School Board, 177 La. 329, 148 So. 248, 250:

"Under article 12 of the Constitution, section 1, free public schools are part of the educational system of the state. In section 10 of that article it is provided that 'The Legislature shall provide for the creation and election of parish school boards which shall elect parish superintendents for their respective parishes.' Pursuant to this mandate, the Legislature of 1922, by Act No. 100, § 17, created a parish school board for each of the parishes of the state and constituted them bodies corporate in law with full power and authority to make rules and regulations for their own government not inconsistent with the rules and regulations of the state board of education. These boards are public corporations and are created for the purpose of administering *for the state* the public school affairs of their respective parishes. Their functions are purely of a public character. In matters relating to the free public schools of their parishes, they are the governing authorities not only for the parish as a whole, but for each and all such school districts as may be created. *They are state agencies, a part of the state government. * * *"* (Emphasis added.)

See State ex rel. Board of School Directors v. City of New Orleans, 42 La.Ann. 92, 7 So. 674, 677; State ex rel. Wimberly v. Barham, 173 La. 488, 137 So. 862, 864; Singelmann v. Davis, 240 La. 929, 125 So.2d 414, 417. See also Appendix A.

Despite defendants' argument to the contrary, none of the recent amendments to Article XII of the Louisiana Constitution have affected the control of public education by the state. See Acts 747 and 752 of 1954; Act 557 of 1958. Indeed, in its most recent form, that Article still provides for a single state system:

"The Legislature shall have full authority to make provisions for the education of the school children of this State and/or for an educational system which shall include all public schools and all institutions of learning operated by State agencies. * * *" La.Const. Art. XII, § 1, L.S.A.

Public education remains the concern of the central state government, and ultimate control still rests with the State Legislature and the State Department of Education. The best proof of this is in the recent history of the New Orleans schools. See cases cited in Note 4, and

---

27. See cases cited in Note 25.

State v. Orleans Parish School Board, La.App., 118 So.2d 471; Singelmann v. Davis, supra. See also La.R.S. 17:1–20, 17:151–166, 17:221–232, 17:261–268, 17:335, 349.4, 17:351–395.6, 17:411–430, 17:441–1304. Nor does Act 2, here involved, change the status of the public school system. Except in the matter of closure, there has been no decentralization; and where closure is ordered under Act 2, the elaborate state-controlled discriminatory scheme, described in Part I hereof, goes into effect. The funds, the supervision, the accreditation, still come from the state.[28] The plain fact is that the state has not even made a pretense of abandoning its control of education to autonomous subdivisions.

In these circumstances, the true focus is not on the doings of any board, but rather on the action of the state government. The discriminatory scheme embodied in Act 2 originated there. It is true that the Legislature has *imposed* no inequality, but its instrument encourages it, expressly permits it. And that is equally condemned. " * * * no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be." Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45. See also Terry v. Adams, supra, 345 U.S. 469, 73 S.Ct. 813, 97 L.Ed. 1152 (opinion of Mr. Justice Black). Applying the rule of Brown to geographical discrimination, "All provisions of federal, state, or local law requiring *or permitting* such discrimination must yield to this principle." (Emphasis added.) Brown v. Board of Education, 349 U.S. 294, 298, 75 S.Ct. 753, 755, 99 L.Ed. 1083.

■ The equal protection clause speaks to the state. The United States Constitution recognizes no governing unit except the federal government and the state. A contrary position would allow a state to evade its constitutional responsibility by carve-outs of small units. At least in the area of declared constitutional rights, and specifically with respect to education, the state can no more delegate to its subdivisions a power to discriminate than it can itself directly establish inequalities. When a parish wants to lock its school doors, the state must turn the key. If the rule were otherwise, the great guarantee of the equal protection clause would be meaningless.

■ The consequence is that the local option device cannot save Act 2. Nothing in the cases cited by defendants suggests that it can. Indeed, in upholding local option liquor laws in Rippey v. State of Texas, 193 U.S. 504, 24 S.Ct. 516, 48 L.Ed. 767, and Lloyd v. Dollison, 194 U.S. 445, 24 S.Ct. 703, 48 L.Ed. 1062, the Court specifically rests its decision not on the local option feature of the challenged legislation but, expressly, on the proposition that the same result would be constitutionally permissible if achieved by direct action of the legislature, because "The state has absolute power over the subject." 193 U.S. at page 510, 24 S.Ct. at page 517; 194 U.S. at pages 448–449, 24 S.Ct. at page 705. The crucial question goes to the substance of the legislation that is being enacted by the local option device. If it violates the equal protection clause or any other constitutional provision, enactment by local option will not save it. More recently, the Court has emphasized that whenever differences are constitutionally inoffensive, it is immaterial how they come into being, whether by local option or through a classification made at the central legislative level. See Fort Smith Light & Traction Co. v. Board of Improvement of Paving Dist., 274 U.S. 387, 391, 47 S.Ct. 595, 71 L.Ed. 1112; Salsburg v. State of Maryland, 346 U.S. 545, 552–553, 74 S.Ct. 280, 98 L.Ed. 281.[29] In short, whatever inequalities

---

28. See Appendix A.

29. The holding of Salsburg v. State of Maryland permitting the state to treat

differently, for different localities, the rule against admissibility of illegally obtained evidence no longer obtains in view of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct.

result from the implementation of Act 2 must be attributed directly to the Louisiana Legislature. As defendants themselves concede, whatever may be the rule with regard to the privilege of dispensing alcoholic beverages, the state itself cannot discriminate in the field of education. There is, of course, greater freedom to classify geographically when the state is regulating a private activity than when it is conferring a governmental benefit. When the state provides a benefit, it must do so evenhandedly. "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873.

There can be no question about the actual inequality in educational opportunities that will follow closure of the public schools in St. Helena Parish, or any other community that invokes the Act. Grants-in-aid, no matter how generous, are not an adequate substitute for public schools. See State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208. If a private school system could be established in St. Helena under the aegis of the state, there would still be lacking the organizational and administrative advantages, as well as economies, of operating as a member of a state system. There would be a total lack of the accreditation that is automatic in the case of a public school but absent in the case of a private school except when the school has met educational standards over a period of years. Moreover, under the Louisiana plan these subsidies would afford entry to segregated schools alone. See James v. Almond, supra, 170 F.Supp. 337. Compare Allen v. County School Board of Prince Edward County, D.C.S.D.Va., 198 F.Supp. 497.

Finally, the requirement of a popular referendum on the question of closure adds nothing to the challenged statute. One of the purposes of the Constitution of the United States was to protect minorities from the occasional tyranny of majorities. No plebiscite can legalize an unjust discrimination.[30] "One's right to life, liberty, and property * * * and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628. See Boson v. Rippy, 5 Cir., 285 F.2d 43, 45.

This is not the moment in history for a state to experiment with ignorance. When it does, it must expect close scrutiny of the experiment. For the reasons stated, we conclude that Act 2 of the Second Extraordinary Session of the Louisiana Legislature for 1961 is unconstitutional. The court will prepare a temporary injunction restraining its enforcement.

## Appendix A

The legislative program for closing those public schools under court order to desegregate (the schools reopening

---

1684. Accordingly, reliance on that decision for the proposition that there is no constitutional inhibition to geographic discrimination in the area of civil rights is misplaced. Salsburg was not a local option case, for it involved simply an endorsement of the classification made by the legislature itself in treating its subdivisions; the Court emphasized that the matter was purely "procedural" and "local". Here, the substantive classification is discriminatory, and reliance is had on local option to save the legislation.

30. No one in the Louisiana legislature could have considered an election under Act 2 as a bona fide local option or as a popular referendum. Published reports for St. Helena showed 1,461 white and 111 Negro voters eligible to vote. Election returns showed 1,147 votes for and 56 against authorizing the School Board to close the schools. This is like having only the cats vote on a program for kittens and young mice. "The right of Negroes to attend the public schools without discrimination upon the ground of race cannot be made to depend upon the consent of the members of the majority race." Kelly v. Board of Education of City of Nashville, D.C.M.D.Tenn., 159 F.Supp. 272, 278.

as segregated private schools subsidized by the state) has an inseparable connection with certain background facts. Although these facts are in the background they dominate the picture as a whole and especially dominate the St. Helena scene. All are within a proper factual frame of reference for an understanding of the picture.

The red dirt hills of St. Helena Parish are on the Mississippi state line, east of East Feliciana Parish, west of Tangipahoa Parish, north of Livingston Parish, and about one hundred miles north-northwest of New Orleans. According to the 1960 census, St. Helena has a population of 9,162, an increase of 79 over 1950. There are 4,076 white persons and 5,086 colored persons in the parish. The largest community, Greensburg, has a population of about 425. The Louisiana Almanac and Fact Book (1956), describing St. Helena, states: "St. Helena is the center of short leaf and loblolly pine production. The principal crops are cotton and corn." See also Rand McNally Commercial Atlas (1960), p. 192. In an earlier proceeding, the district attorney for St. Helena Parish told the court: "St. Helena is strictly a country parish with no industries whatsoever, where the only industries are welfare and politics." The estimated 1960 per capita income (after taxes) of St. Helena was $894 against $1,474 for the state and $1,974 for the nation. Sales Management Annual Survey of Buying Power, May 10, 1961, pp. 156, 157, 690. Figures for 1960 show 852 public welfare grants to 1,325 persons in St. Helena at an annual cost of $768,000. Louisiana Public Welfare Statistics, State of Louisiana Public Welfare Department, June 1961, Table 14, p. 20.

All of Louisiana's parishes receive substantial support from the state: a total for all parishes of 77 per cent, 72 per cent through direct support and 5 per cent through state payment of school taxes on exempt homesteads. In 1957–58 state support of school operations amounted to 85 per cent of operating revenues, 82 per cent through direct state support for school operations. In 1957–58 only two of Louisiana's 67 school systems provided more than 30 per cent of their operating revenues from local sources. In 1957–58 St. Helena received 97.1 per cent of its public school operating revenues from state and federal sources; only two other parishes received a greater percentage of non-local aid to public schools. See Financing Public Schools, a PAR study published by the Public Affairs Research Council of Louisiana (1959), pp. 11, 12, 30–31. See also Circular No. 4615, Aug. 20, 1960, Louisiana State Department of Education, and Bulletins 887 and 904 of the Louisiana State Department of Education.

The Louisiana Constitution (Article 12, Section 14) requires three-fourths of the State Public School Fund to be distributed to the parish school boards in the proportion that the number of educable children, from six to eighteen years of age inclusive, bears to the total number of such educable children in the state. The affidavit of J. L. Meadows, Superintendent of the St. Helena Parish School Board, filed in the record, shows that for 1959–60 St. Helena received from this fund $159,280. The other one-fourth of the State Public School Fund, known as the "Equalization Distribution Fund", assures sufficient revenues to permit every parish school system to maintain a minimum or foundation educational program. The approved formula for distributing this fund is under the State Board of Education and is established under rules and regulations set forth in the Constitution of Louisiana, Article XII, Section 14. Mr. Meadows stated that the St. Helena School Board received $683,312 from this fund for 1960–61; $20,000 from other state sources; and $24,774 from the five mill ad valorem tax authorized for the operation and maintenance of the schools in St. Helena. According to Mr. Meadows, for 1958–59 the St. Helena School Board had a deficit of $110,000.

Bulletin 904, the 110th Annual Report of the State Department of Education of Louisiana 1958–59, shows that the St.

Helena School Board received $901,080 from state, federal, and special sources, (Table 111, p. 173); $47,548 from parish sources (Table 111, p. 177). Total expenditures, balances, and overdrafts for 1958–59 amounted to $1,363,009 (Table 111, p. 261).

As of January 30, 1959, the annual inventory of Louisiana Public School property, published by the State Department of Education, showed $344,067,-058 as the total cost of buildings, sites, and equipment for all white schools, and $131,255,672 for all Negro schools; $555,711 for white schools in St. Helena and $483,308 for Negro schools. Bulletin 904, Department of Education, Table XIII, pp. 319–320.

The total indebtedness as of June 30, 1959, of all school boards in the 67 school districts in Louisiana was $325,007,869; $961,773 in St. Helena, secured by a special tax for construction. Bulletin No. 904, Department of Education, Table VII, p. 279.

There are very few private schools in Louisiana except in parishes having a large Catholic population. There are no private schools for white or Negro students in St. Helena and none in the adjacent parishes (except for three Catholic elementary schools for white students in Tangipahoa). See Louisiana School Directory, Session 1960–61, Bulletin No. 923, State Department of Education of Louisiana.

There is a close correlation between the statewide effort to raise the educational level in Louisiana and the necessity for state aid to parishes having a sub-par economy. Among the 50 states, in terms of percentage, Louisiana ranks 50th from the top in the number of its citizens, 25 years or older, having five years schooling; 44th in the number of persons having four years of high school; 48th in the success of its citizens in passing Selective Service Mental Tests; 48th in those 14 years or older able to read. But in 1959 it ranked first among the states in the ratio of state expenditures for schools to personal income;

seventh in the ratio of state revenues to state aid to schools; third in the estimated revenue from state sources per instructional staff member ($6,678); and fifth in revenues from state sources per pupil ($298). Research Report 1960–R1, Ranking of the States, National Education Association. This mighty effort on the part of Louisiana is a phase of the educational problem that is often overlooked. Continuance of the effort at comparable level by private persons, commendable as it might be, would impose a disproportionately heavy burden on such parishes as St. Helena.

These statistics demonstrate beyond a doubt that public education in Louisiana is not, as the defendant contends, a matter of local concern. The system is based on the concern of the whole state for all its citizens. It could not have developed without the state; it could not have been operated except by the state. A parish such as St. Helena receives 97.1 per cent state (and some federal) help because the state as a whole has a direct interest in equalizing educational opportunities so as to aid under-privileged parishes. St. Helena receives $405.73 from the state for each pupil (taking the average daily attendance) as against $332.33 the Orleans Parish School Board receives per pupil—because the state is not willing to allow the St. Helena school children to receive an education inferior to the education offered school children in New Orleans.

These then are dominating facts: (1) there are no existing private schools in St. Helena; (2) adequate facilities, buildings, and equipment, to be anywhere nearly equivalent to existing public school facilities would cost in excess of one million dollars; (3) the present annual local contribution of $47,000 is far below the present annual operating expense of over a million dollars; (4) excluding fringe expenses, in order to equal the allowance the state now turns over to St. Helena, tuition for each child would amount to $405.73. It is dead certain, therefore, that absent active, extensive unconstitutional state sup-

port of private schools, closing of public schools in St. Helena under Act 2 will mean the end of school education for all children in the parish, white and Negro, except a handful of well-to-do white children. This then is the legislature's option: segregated schools contrary to the equal protection clause—or no schools.