Bryan **POINDEXTER** et al.

v.

**LOUISIANA FINANCIAL ASSISTANCE COMMISSION** et al.

**Civ. A. No. 14683.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 19, 1968.

Judgment Affirmed Oct. 14, 1968.
See 89 S.Ct. 48.

---

Michael Davidson, Charles Jones, and A. P. Tureaud, New Orleans, La., for plaintiffs.

Hugh W. Fleischer and Joseph Ray Terry, Jr., New Orleans, La., U. S. Dept. of Justice, for plaintiff-intervenors.

Leander H. Perez, Sr., New Orleans, La., and Luke A. Petrovich, Buras, La., for Louisiana Education Commission for Needy Children.

Richard C. Cadwallader, Baton Rouge, La., and "Cy" D. F. Courtney, New Orleans, La., for parents and directors of four non-sectarian Negro schools in Orleans Parish.

Samuel I. Rosenberg, New Orleans, La., for Orleans Parish School Bd.

Before WISDOM and AINSWORTH, Circuit Judges, and CHRISTENBERRY, District Judge.

WISDOM, Circuit Judge:

The free lunches and textbooks Louisiana provides all children in public and private schools are the fruits of a benevolent racially neutral policy. But Louisiana's tuition grants to children attending private schools are the product of the State's traditional racial policy of providing segregated schools for white children. Act 99 of 1967, now before us, followed Act 147 of 1962, which replaced Act 3 of the Second Extraordinary Session of 1960, which in turn replaced Act 258 of 1958, the legislature's first, and

unsubtle, system of grants-in-aid [1]. In each succeeding act the scheme became more subtle, the language more sophisticated. But, as the Court said in Lee v. Macon County Board of Education, M.D. Ala.1967, 267 F.Supp. 458, 477, in discussing a parallel series of tuition grants in Alabama: "the present tuition statute was born of the same effort to discriminate against Negroes, and was designed to fill the vacuum left by this Court's injunction against the [earlier] tuition statute." The purpose of Act 99 of 1967, like the purpose of its predecessors, is to give state aid to private discrimination. With each new scheme of tuition grants, the State nourished segregated schools which could not have come into existence or have continued without the nourishment provided under the earlier discriminatory schemes. The continuing effect is to endanger the public school system and equal educational opportunities for Negroes. Such legislation tends to undermine the not inconsiderable progress made in this state toward avoiding the division of our people into two implacably hostile groups.

Act 99 must go the way of its predecessors. Its "unlawful end and necessary effect" is "to establish and maintain a system of segregated schools for white children, in violation of the equal protection clause." Poindexter v. Louisiana Financial Assistance Comm., E.D.La. 1967, 275 F.Supp. 833, 851 (Poindexter II)[2].

## I.

August 25, 1967, this court held Act 147 of 1962, the Louisiana grant-in-aid statute, unconstitutional and enjoined the Louisiana Financial Assistance Commission from carrying out the provisions of the Act. September 1, 1967, the United States, as plaintiff-intervenor in the original cause, moved to file a supplemental complaint adding the Louisiana Education Commission for Needy Children and its members as defendants. The complaint asks that Act 99 of 1967 be declared unconstitutional and that the defendants be enjoined from carrying out the Act. We granted the plaintiff-intervenor's motion to file a supplemental complaint and, after a hearing, issued a temporary order restraining the defendants from "providing directly or indirectly any financial or other material support to any private school or any student attending a private school." We allowed the Education Commission to process applications pending our determination of the merits of the supplemental complaint [3].

The defendants objected to our entertaining the plaintiff-intervenor's supplemental complaint after entry of a final decree in the original cause. One of the grounds of objection was that the Supreme Court, before which an appeal from our judgment in Poindexter II had been taken, might decide that the judgment was not final and thus refuse to entertain that appeal until our action on the supplemental complaint. This argument fell of its own weight when the Supreme Court affirmed this court's judgment, per curiam, January 15, 1968. Louisiana Financial Assistance Comm. v. Poindexter, 1968, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780.

■ The defendants assert that the general rule is that no additional complaint may be filed in a proceeding after entry of a final decree. Rule 15(d) contains no such limitation, but gives the court discretionary power to permit supplementary pleadings alleging events that occurred after filing of the original com-

---

1. See Poindexter v. Louisiana Financial Assistance Comm., E.D.La.1967, 275 F. Supp. 833, 841–845.

2. In our first opinion, Poindexter I, we dealt with the procedural aspects of the case, holding that the plaintiffs had standing to sue, that the defendants were properly joined, and that a three-judge court was proper under the allegations of the complaint. Poindexter v. Louisiana Financial Assistance Comm., E.D. La.1966, 258 F.Supp. 158. Poindexter II, cited in the text, is our decision on the merits of the complaint.

3. The Commission voluntarily stopped processing applications after our order.

plaint. See generally 1A Barron & Holtzoff, Federal Practice and Procedure § 455 (Wright ed. 1960). Unquestionably the supplemental complaint made sufficient allegations to bring it within the purview of Poindexter II. And the Order of this Court of August 25 provided explicitly that "This Court retains jurisdiction of this cause to amend or modify this decree or to issue such further orders as may be necessary and appropriate." 275 F.Supp. at 857.

In Aaron v. McKinley, E.D.Ark.1959, 173 F.Supp. 944, aff'd sub nom. Faubus v. Aaron, 1959, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237, the plaintiffs were permitted to file a supplemental complaint attacking legislation enacted while an appeal from a final order of the trial court was pending. The new legislation was designed to supplant that held invalid by the district court and was signed into law on the same day the Supreme Court handed down its decision disposing of the appeal. The court in Bush v. New Orleans Parish School Bd., E.D.La. 1960, 187 F.Supp. 42, aff'd per curiam, 1961, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed. 2d 806, granted the plaintiffs leave to file a supplemental complaint and add additional defendants. after a notice of appeal from the decree of the trial court had been filed. Finally, Griffin v. County School Bd. of Prince Edward County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256, supports our conclusion. After a reversal of the district court's original judgment and a remand to that court by the Fourth Circuit in Allen v. County School Bd. of Prince Edward County, 4 Cir. 1959, 266 F.2d 507, the district court entered a permanent injunction against racial discrimination in the operation of the Prince Edward County school system. Both a supplemental complaint and an amended supplemental complaint were entertained by the court subsequent to issuance of the injunction. The supplemental pleadings added new defendants and sought an order preventing the distribution of tuition grants to pupils attending private segregated schools. The Supreme Court approved the filing of the supplemental pleadings in the following language:

> The amended complaint thus was not a new cause of action but merely part of the same old cause of action arising out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people, a desire thwarted before 1959 by segregation in the public schools and after 1959 by a combination of closed public schools and state and county grants to white children at the Foundation's private schools. Rule 15(d) of the Federal Rules of Civil Procedure plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary. Such amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice. 377 U.S. at 226–227, 84 S.Ct. at 1231.

## II.

Act 99 (LSA–R.S. 17:2971–2981) was enacted by the State of Louisiana on June 15, 1967. It was to be put into operation only if and when the earlier grant-in-aid legislation was invalidated by this court[4]. The Act creates the Louisiana Education Commission for Needy Children and authorizes the Commission to disburse tuition grants to "private non-sectarian elementary or secondary school[s]" for children attending such schools within the state. The Commission is composed of the Lieutenant Governor, the Secretary of State, and the Treasurer, ex officio. The Director, James D. Fountain, appointed by the Commission, had formerly served as Director of the Louisiana Financial Assist-

---

4. It was termed "stand-by" legislation by its supporters in the legislature, and in Poindexter II we observed that at the time Act 99 was "waiting in the wings". 275 F.Supp. at 844.

ance Commission—the commission set up under the former tuition-grant statute; the Commission established its offices in the same Baton Rouge and New Orleans locations where the old Financial Assistance Commission had been located.

Facially, the purpose of Act 99 is set out in Section 2, LSA–R.S. 17:2972, as follows:

> The Legislature of Louisiana, mindful of the increase in juvenile delinquency, school dropouts and juvenile crime rates; and mindful that the parent, not the State of Louisiana, shall be the determining force which shall decide on the type of education ultimately received by the child; and mindful of the fact that many parents enroll their children in public education facilities even though they have dispositions or considerations against doing so, because they lack the finances which would enable them not to do so; and mindful that such dispositions and considerations are passed from the parent to the child, resulting in possible juvenile delinquency, school dropouts and juvenile crime, hereby declares that it is the policy of this state to provide financial aid scholarships to needy children enrolled in private nonsectarian elementary and secondary schools located in this state whose parents choose not to enroll said children in the public education facilities of this state because of such dispositions and considerations.

The amount of tuition grant is computed by reference to a sliding scale in Section 5(C), LSA–R.S. 17:2975(C.), which has as variables the net income of and number of dependents in the family of the recipient. The maximum amount that can be received on behalf of any student is $350 for a school year

(Act 147 provided for a maximum of $360), and the total amount of tuition grants during any fiscal year is limited by the statute to $35,000,000 [5].

The primary differences between Act 147 of 1962 and Act 99, then, are the statutory language of purpose and the coordination between financial need and amount of assistance in the latter. Because we consider these distinctions merely superficial, we find Act 99, like Act 147, unconstitutional. As we have often repeated,

> Irrespective of the terms of a statute, particularly in the area of racial discrimination, courts must determine its purpose as well as its substance and effect. * * * "[A]cts generally lawful may become unlawful when done to accomplish an unlawful end." Poindexter II, 275 F.Supp. at 837.[6]

### III.

A. The purpose and motive for enactment of Act 99 must be considered through the same approach used in our analysis of Act 147—"in the light of its history and present setting". Poindexter II, 275 F.Supp. at 839; see United States v. Louisiana, E.D.La.1963, 225 F.Supp. 353, 363, aff'd 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; Lee v. Macon County Bd. of Educ., M.D.Ala.1967, 267 F.Supp. 458, 476. We do not find it necessary to repeat that relevant history outlined in our earlier opinion, 275 F.Supp. at 838–845; we merely adopt our conclusion regarding this issue from that decision:

> Open legislative defiance of desegregation orders shifted to subtle forms of circumvention—although some prominent sponsors of grant-in-aid legislation have been less than subtle

---

5. The maximum expenditure under Act 147 was $300,000 a month. Under Act 147 payments were to be drawn from the Education Expense Grant Fund, established by transfers from the Public Welfare Fund. Disbursements under Act 99 are to be made directly from the Public Welfare Fund.

6. Accord, Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; United States v. Louisiana, E.D.La.1963, 225 F.Supp. 353, aff'd, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; Hall v. St. Helena Parish School Bd., E.D.La.1961, 197 F.Supp. 649.

in their public expression. But the changes in means reflect no change in legislative ends. 275 F.Supp. at 845. Act 99 is indeed more sophisticated than Act 147; more so also than the two earlier Louisiana grant-in-aid laws, Act 258 of 1958 and Act 3 of 1960 [7]. But, as the Supreme Court said in Lane v. Wilson, 1939, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, 1287, the Constitution "nullifies sophisticated as well as simple-minded modes of discrimination." See also Smith v. Texas, 1940, 311 U.S. 128, 132, 61 S.Ct. 164, 165, 85 L.Ed. 84.

Openly acknowledging that Act 99 was a "stand-by" grant program to be implemented only if Act 147 were declared unconstitutional,[8] the sponsors of the bill were nonetheless careful with their floor statements in its support.[9] Despite this, it appears clear that Act 99 was carefully tailored in its journey through the legislature to avoid *too much* state involvement in the maintenance of private schools (so that the bill would not "come under the Fourteenth Amendment and the Federal Government * * * again control the private schools"),[10] while still sufficiently supporting private schools as an alternative to a public system only recently subject to more stringent desegregation guidelines.[11] See United States v. Jefferson County Bd. of Educ., 5 Cir. 1966, 372 F.2d 836, aff'd en banc, 1967, 380 F.2d 385.

Act 99 reflects concern of the legislature that "many parents enroll their children in public education facilities even though they have dispositions or considerations against doing so". Section 2. When viewed in the context of the facts presented in our earlier opinion and the circumstances reflected in our observations above, it is clear that the legislature was recognizing that many parents would not want to enroll their children in desegregated public schools. This provision is similar to that in the Alabama tuition-grant statute that based eligibility for a grant on the parent's judgment that the child's attendance at public school would be detrimental to the child's "physical and emotional health". Striking down Alabama's statute, the court in Lee v. Macon County Bd. of Educ., M.D.Ala.1967, 267 F.Supp. 458, 477, looked at the purpose and effect of the statute and concluded that eligibility for tuition grants turned "on the parent's dissatisfaction with sending his child to a desegregated public school". It determined that in the final analysis this legislation was part of "a concerted effort to establish and support a separate and private school system for white students".

The defendants point to juvenile delinquency as the evil the grant-in-aid statute is designed to remedy. They have not coordinated their arguments on this

---

7. Those acts were held unconstitutional in Bush v. Orleans Parish School Bd., E.D.La.1960, 187 F.Supp. 42, and in Hall v. St. Helena Parish School Bd., E.D.La.1961, 197 F.Supp. 649, aff'd per curiam, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed. 2d 521.

8. The New Orleans Times-Picayune, May 30, 1967; The New Orleans States-Item, May 29, 1967; The New Orleans Times-Picayune, May 31, 1967; The New Orleans States-Item, May 31, 1967.

9. See, e. g., the acknowledgement of Senator E. W. Gravolet, Jr., sponsor and Senate floor manager, while arguing against several proposed amendments to Act 99, that "Anything I say at this

microphone can be used". The New Orleans Times-Picayune, June 2, 1967.

10. Statement of Senator Gravolet in objection to amendments requiring private schools supported under Act 99 to meet the same curriculum and other standards as public schools. The New Orleans Times-Picayune, June 2, 1967. See also the statement of Representative John Garrett in objection to a proposed amendment that would have required schools attended by tuition grant recipients to have recognition and approval of the State Board of Education. The New Orleans Times-Picayune, May 30, 1967.

11. The New Orleans Times-Picayune, May 23, 1967; The New Orleans Times-Picayune, May 31, 1967.

issue, however, for they tell us on the one hand that public schools are the hotbed of juvenile delinquency—necessitating maintenance of private schools as retreats for our bright young citizens—and on the other hand that private schools function usefully to drain off potential troublemakers and to give special treatment to them that cannot be found in public schools. In essence, this juvenile delinquency argument is grounded upon a feeling that the state should establish an alternative segregated school system for white students because of an alleged community hostility toward and alleged physical altercations resulting from public school desegregation. The excuse that desegregation will endanger public safety has been given time and again and in many contexts; invariably the Supreme Court and lower courts have brushed it aside. Fifty years ago, in Buchanan v. Warley, 1917, 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149, 163–164, the Supreme Court said:

> It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution.

Ten years ago, in Cooper v. Aaron, 1958, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 15, the Court repeated the quotation from *Buchanan*, preceding it with:

> The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. * * *

Neither the cry of juvenile delinquency, nor the plea for retarded children—black and white—can obscure the true purpose of Act 99. The defendant-intervenors' concern for the retarded children of this state, a worthy and, we believe, genuine concern, is in reality a misplaced afterthought.[12] Act 99 gives no special attention to retarded children; benefits to them from the Act are coincidental. Actually, reference to aid to retarded children, appearing in the original version of the Act, was deleted by committee amendment before its passage.[13]

■ B. While consideration of both purpose *and* effect is desirable in this case, at least one court has suggested that grant-in-aid "payments would be unconstitutional where they are designed to further *or* have the effect of furthering said segregation in the public schools." Lee v. Macon County Bd. of Educ., M.D.Ala.1964, 231 F.Supp. 743, 754 (emphasis added). Courts have invalidated laws before they have gone into effect on the basis of predictions of prospective operation, e. g. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; so also have court orders been designed to alleviate effects of de facto discrimination in an education system, where there was no question of motive or purpose. Hobson v. Hansen, D.D.C. 1967, 269 F.Supp. 401. While purpose and motive behind Act 99 is clear, as we related above, the Act has not yet gone into operation, so *actual* effect cannot be ascertained.

It appears to us that the necessary effect of Act 99 would be substantially identical to that of Act 147 of 1962. The program under Act 99 was rightfully termed a "stand-by" by its sponsors and by the Governor, for it has the same ad-

---

12. The rationalizations for passage of Act 99 appear in part to be drawn from the criticism of the court in Lee v. Macon County Bd. of Educ., M.D.Ala.1967, 267 F.Supp. 458, that the Alabama tuition-grant statute could be explained on no "rational basis".

The statute does not manifest state concern for equalizing the opportunity of all children, including the poor, to attend private schools, for the statute does not require a showing of financial need. Nor does the statute exhibit state concern for improving the educational opportunities of special classes of students—those who may be gifted or those who may be handicapped.

13. The New Orleans Times-Picayune, May 26, 1967.

ministrative personnel, the same office space, almost the same annual budget. The act benefits the same schools which came into existence because of the earlier grants-in-aid. In its first days of operation the Commission for Needy Children distributed over fifteen thousand tuition-grant forms—the approximate number of student recipients of grants under the prior law. Applications were received during these first days by the Commission from approximately seventy private schools, all but one of which were schools attended by tuition-grant recipients during the past school year.[14] Our inference drawn in Poindexter II, "that the state's tuition grants were directly responsible for the founding of most of the post-Brown special schools and that these schools continue to exist because of the state's educational policy of segregation", still stands. Poindexter II, 275 F.Supp. at 848.

The inevitable effect of the tuition grants was the establishment and maintenance of a state-supported system of segregated schools for white children, making the state a party to organized private discrimination. * * The tuition grants damage Negroes by draining students, teachers, and funds from the desegregated public school system into a competitive, segregated "quasi-public" school system. The stamp of State approval of "white" schools perpetuates the open humiliation of the Negro implicit in segregated education. 275 F.Supp. at 845, 851.

\* \* \* \* \* \*

In accordance with the findings of fact and conclusions of law in the foregoing opinion, it is hereby ordered that the defendant Louisiana Education Commission for Needy Children, its members, officers, agents, servants, employees and successors in office, and all those who are acting or may act in concert or participation with them, are hereby restrained,

enjoined, and prohibited from enforcing or seeking to enforce by any means the provisions of Act 99 of the 1967 Session of the Louisiana Legislature.

This Court retains jurisdiction of this cause to amend or modify this decree or to issue such further orders as may be necessary and appropriate.

The costs incurred in this proceeding to date are hereby taxed against the defendants.

14. The additional school was not in existence prior to the present school year. Only nine schools receiving grants under the prior statute have not reapplied under Act 99; these must, at least in part, represent some of the established, elite private schools whose students' families could not qualify under the financial need section of the Act.