**Delores NORWOOD et al., Plaintiffs,**

v.

**D. L. HARRISON, Sr., et al.,
Defendants.**

**No. WC 70–53–K.**

United States District Court,
N. D. Mississippi, W. D.

March 2, 1976.

Melvyn R. Leventhal, New York City, for plaintiffs.

Ed Davis Noble and Giles W. Bryant, Asst. Attys. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Today we write a postlude to this protracted litigation involving Mississippi's program of furnishing state-owned textbooks to private as well as public schools by ruling on plaintiffs' motion for an award of attorneys' fees for legal services rendered since commencement of the case almost six years ago. We hold that an award is mandated here by § 718 of the Emergency School Aid Act, 20 U.S.C. § 1617, and also that the Eleventh Amendment, as explicated in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and other cases, does not require us to declare unconstitutional this Act of Congress.

This case began as a class action challenge by black citizens, as parents of public school students in Tunica County, Mississippi, to the constitutionality of Miss.Code Ann. § 6634 et seq. (1942), a statute providing for the State's distribution of free state-owned textbooks to all school children in all elementary and secondary grades in Mississippi, whether attending public or private schools. Named as defendants were the executive secretary and members of the Mississippi State Textbook Purchasing Board. The complaint was addressed particularly to the statute's effect in providing state-owned textbooks to students attending schools alleged to be all-white or academies having racially discriminatory admission policies. Since the complaint sought to enjoin enforcement of a statute of apparent statewide application, a three-judge court was convened which upheld the Act's constitutionality. *Norwood v. Harrison*, 340 F.Supp. 1003 (N.D. Miss.1972) (three-judge court).

On appeal, the Supreme Court of the United States reversed, holding that the Equal Protection Clause forbade direct or indirect state aid to private segregated schools, irrespective of the purpose of the assistance or whether the state aid gave any appreciable support to the maintenance of segregated education. *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). Recognizing that all private schools in Mississippi could not be presumed guilty of racial discrimination, the Court remanded with instructions to the district court to determine, on a school-by-school basis, the eligibility vel non of private schools in the State to receive continued state textbook aid.

After remand, the three-judge court was dissolved and the case remanded to this court to establish an appropriate certification procedure. Pursuant to the Supreme Court's directive, we conducted a school-by-school eligibility examination, completing the process in *Norwood v. Harrison*, 382 F.Supp. 921 (N.D.Miss. 1974). Immediately thereafter, plaintiffs filed their motion for an attorneys' fee award and submitted their itemized cost bill. Since the motion and cost bill sought an assessment against defendant state officials which, if granted, would almost surely be satisfied with state funds, serious Eleventh Amendment questions were presented. Aware that the constitutionality of a similar award was pending before the Court of Appeals for the Fifth Circuit, sitting en banc in another case from this court, *Gates v. Collier*, 371 F.Supp. 1368 (N.D.Miss.) aff'd, 489 F.2d 298 (5 Cir. 1973), pet. for

reh. en banc granted, 500 F.2d 1382 (5 Cir. 1975), we delayed our ruling here, hoping that the difficult constitutional issues would be resolved by the higher court. Instead, the Fifth Circuit chose not to dispose of the Eleventh Amendment question and remanded *Gates* for further consideration in light of *Edelman* and *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). *Gates v. Collier*, 522 F.2d 81 (5 Cir. 1975) (en banc).

Without reason for further delay, we proceed now to a ruling, conscious of two major issues which demand resolution. The first is, of course, whether the Eleventh Amendment to the United States Constitution bars federal courts from making assessments of attorneys' fees and costs against an unconsenting state defendant in litigation which seeks injunctive and declaratory relief from unconstitutional state action. If the Eleventh Amendment is not found to present a bar to the award of attorney fees and taxable costs here, we must confront the problem presented by *Alyeska.* There, the Supreme Court invalidated the "private attorney general" concept for the award of attorneys' fees and gave notice that, except in limited circumstances, no award of attorneys' fees to prevailing litigants is proper in the federal courts without express congressional authorization. Thus, before an award may be made in this case, the legal services rendered by plaintiffs' counsel must be compensable under an Act of Congress or fall within one of the narrow exceptions to the general rule enumerated in *Alyeska.*

*The Eleventh Amendment Issue*

On its face, the Eleventh Amendment appears to present a barrier to any award of attorneys' fees (or for that matter court costs) which will ultimately be paid from the coffers of a state treasury:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

This Amendment has received increased attention since the Supreme Court, in *Edelman*, held that a retroactive award of wrongfully withheld state welfare benefits could not be made by the federal courts, since "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." Edelman, supra, 415 U.S. at 663, 94 S.Ct. at 1355, 39 L.Ed.2d at 672. Whether an attorney fee or cost award, liability for which accrues incidental to legitimate federal court litigation, may be imposed against the state treasury is a question which has split the courts of appeals [1] and has not been finally answered by the Supreme Court.

■ Only recently we addressed this important question and concluded that "where, as here, an action is brought seeking prospective injunctive and declaratory relief which has only the 'ancillary effect on the state treasury' permitted by *Ex parte Young* and expressly approved in *Edelman*, expenses incident to and arising from the prose-

---

1. The First, Second and Fourth Circuits have concluded that attorney fee awards payable from state funds are permissible under *Edelman* and the Eleventh Amendment. *Boston Chapter NAACP, Inc. v. Beecher*, 504 F.2d 1017 (1 Cir. 1974); *Fitzpatrick v. Bitzer*, 519 F.2d 559 (2 Cir. 1975); *Class v. Norton*, 505 F.2d 123 (2 Cir. 1974); *Jordan v. Fusari*, 496 F.2d 646 (2 Cir. 1974); *Thonen v. Jenkins*, 517 F.2d 3 (4 Cir. 1975); the Third and Sixth Circuits have held the Eleventh Amendment to bar such awards, *Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d 31 (3 Cir. 1974); *Jordan v. Gilligan*, 500 F.2d 701 (6 Cir. 1974). Our own Fifth Circuit, which has considered the matter no less than four times, has not yet adopted a final position. Compare *Gates v. Collier*, 489 F.2d 298 (5 Cir. 1973), with *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.*, 496 F.2d 1017 (5 Cir. 1974); and *Gates v. Collier*, 522 F.2d 81 (5 Cir. 1975) (en banc); *Newman v. State of Alabama*, 522 F.2d 71 (5 Cir. 1975) (en banc).

cution of such litigation, including attorneys' fees and costs, may constitutionally be assessed against state defendants. Such awards are essential to the proper functioning of the federal judicial process and ensure that the protection of the constitutional rights afforded by *Ex parte Young* and its progeny does not become illusory." (Footnote omitted). *Gates v. Collier,* 70 F.R.D. 341 (N.D.Miss.1976).

It is unnecessary to here repeat the rationale set forth in our *Gates* opinion, but until the Fifth Circuit speaks otherwise, we adhere to the view that attorneys' fee and cost awards are both "ancillary" and "prospective" within *Edelman*'s meaning and are not within the bar of the Eleventh Amendment.[2]

### The Applicability of § 718 of the Emergency School Aid Act

As noted, *Alyeska* has sharply restricted the bases upon which awards of attorneys' fees can be made to prevailing litigants in constitutional litigation by eliminating the "private attorney general" concept for attorney fee grants. Plaintiffs urge alternate rationales upon which an award can be premised in this case without violating the directive of the Supreme Court in *Alyeska.*

█ First, it is contended that the defendants' conduct of this litigation fits within the "bad faith, vexatiously, wantonly, or for oppressive reasons" exception recognized by *Alyeska,* supra, 421 U.S. at 258, 95 S.Ct. at 1622, 44 L.Ed.2d at 154, as a case in which an attorneys' fee is allowable by a federal court even without express statutory authorization. This argument is patently without merit, however, and must be rejected. As exemplified by the first holding of the three-judge district court, this case, on its merits, was not one in which well-settled constitutional principles pointed un-

mistakably to only one sure result which defendants unreasonably resisted. To be sure, a vigorous defense was presented in favor of the challenged statute, and the State's administration of textbook aid, but the mere fact that textbook aid, as officially administered under the Act, was ultimately adjudged to be unconstitutional as applied to segregated, private schools with racially discriminatory admission policies does not bring the defendants' defense within the "bad faith" exception recognized by *Alyeska.* Moreover, once the Supreme Court spoke, the defendants posed no resistance whatever to the implementation of the Court's decree or to the case-by-case evaluation which this court subsequently made. Neither do we perceive that any other judicial exception recognized in *Alyeska* pertains here to authorize the imposition of an attorney fee upon the opposing litigant.

Alternatively, plaintiffs urge an attorneys' fee award in this case under § 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, which provides:

"Upon entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of Title VI of the Civil Rights Act of 1964, or the Fourteenth Amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

To qualify under the terms of § 718, plaintiffs must satisfy each of the crite-

---

**2.** As noted in *Gates,* we can find no rational basis on which to distinguish between attorneys' fees and costs for Eleventh Amendment purposes. Here, substantial court costs were timely taxed by the plaintiffs, an assessment to which defendants interposed no objection.

We have examined plaintiffs' cost bill and find the items therein listed fully authorized to the extent of $4,999.44, which we tax as costs as a matter of course pursuant to Rule 54(d), F.R. Civ.P.

ria set out by the Act. To begin with, unquestionably a final order has been entered in this case within the statute's meaning. As the Supreme Court has said in this connection:

"To delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel, and discourage the institution of actions, despite the clear congressional intent to the contrary evidenced by the passage of § 718. A district court must have discretion to award fees and costs incident to the final disposition of interim matters." *Bradley v. Richmond School Board*, 416 U.S. 696, 723, 94 S.Ct. 2006, 2022, 40 L.Ed.2d 476, 495 (1974).

Our comprehensive order of July 12, 1974, which finally disposed of the substantive issues and settled the eligibility of textbook aid for almost all private schools in the State, clearly meets this definition of finality, though continuing jurisdiction was retained over the case. Nor can there be any doubt that this action against the members and executive secretary of the Mississippi State Textbook Purchasing Board qualifies as one against a state agency.

Moreover, it is manifestly clear that the suit was necessary to end the practice of providing state textbook aid to racially segregated private schools in violation of the Fourteenth Amendment and therefore essential to bring into constitutional compliance the defendants' administration of the free textbook program. Section 6634 et seq. of the Mississippi Code had been on the books almost 30 years when this suit was instituted, some 16 years after *Brown I*. Neither the officials charged with administering the state textbook program nor state lawmakers evinced concern that practices antedating *Brown I* needed alteration in view of the dramatic development of private academies in the State during the era of public school desegregation. Hence, after the present suit was filed and until the Supreme Court's ruling defendants asserted the constitutionality, not to mention the social desirability, of providing textbook aid to all students, including those enrolled in schools maintaining racially discriminatory admission policies. This practice of supplying textbooks indiscriminately would, no doubt, have not been abated but for the successful prosecution of this suit.[3]

The remaining question of § 718 applicability is whether this suit, brought to prevent state aid to racially discriminatory all-white private schools, is one arising under the Fourteenth Amendment as it pertains to elementary and secondary education. Defendants suggest that § 718 was intended to apply only to actions brought to eradicate racial segregation in the public schools, and not to cases such as this, which arguably might

---

**3.** In our earlier opinion, we outlined the considerable impact of plaintiffs' success in this litigation vis-a-vis Mississippi's private academies:

"Before *Norwood*, 107 private academies received [textbook] aid; after *Norwood*, 33 academies applied for state textbooks in accordance with certification procedure established by this court upon remand. Of this number, the Board at the administrative level found 5 ineligible and approved 28. Plaintiffs filed objections to 24 schools approved by the Board. Pending appeal to this federal district court, 13 private academies were able to satisfy, by stipulation, challenges raised by plaintiffs. As previously stated, 4 academies voluntarily withdrew their requests for textbooks after challenge; and we have herein found 4 more academies ineligi-

ble, 2 qualified, and one approved only conditionally for one year [which elected to surrender textbooks at year's end rather than submit to further evidentiary hearing]." *Norwood v. Harrison*, supra, 382 F.Supp. at 935.

Thus, 88 of 107 private schools now extant in Mississippi lost state textbook aid as a direct result of this action. Furthermore, at least 13 private academies elected to change their procedures in order to satisfy the private plaintiffs that they were no longer guilty of racial discrimination. The relief secured by the plaintiffs has an additional, continuing impact, in that henceforth no private school in Mississippi may receive, ab initio, state textbook aid without the prior approval of this court. 382 F.Supp. at 935.

have little nexus with the desegregation process.[4]

We disagree. Our first point of reference is the literal terms of § 718. This suit, and our final order, were occasioned by the State's failure to comply with the Equal Protection Clause of the Fourteenth Amendment by impermissibly extending state aid for the support of segregated elementary and secondary education. Section 718 speaks to cases where "discrimination on the basis of race, color, or national origin in violation of . . . the fourteenth amendment" occurs and is overthrown by the prevailing party in a court of the United States. That such discrimination existed may not be open to doubt after the Supreme Court's holding. "[I]f the school engages in discriminatory practices the State by tangible aid in the form of textbooks thereby gives support to such discrimination." *Norwood v. Harrison,* supra, 413 U.S. at 464–65, 93 S.Ct. at 2810, 37 L.Ed.2d at 731. Indeed, if there were no acts of racial discrimination by the defendant state officials in this case, no supportable basis for the Court's holding could be gleaned from its opinion.

The legislative history of § 718 also provides a measure of support, albeit marginal. The House version of the Emergency School Aid Act contained no attorney fee provisions. 1972 U.S.Code Cong. & Admin.News p. 2668. In the Senate, where the Act was first designated as the Emergency School Aid and Quality Integrated Education Act of 1971, § 718's attorney fee provisions were adopted, and thereafter incorporated into the final version approved by the House-Senate Conference Committee. Although the Senate Report makes no direct mention of attorneys' fees, it does suggest that Congress intended § 718 to apply in litigation other than public school desegregation suits by stating that the Act "prohibits funding [school] districts which, after enactment . . . have engaged in the following practices: (a) Aid to segregated private academies; . . . ." 1972 U.S.Code Cong. & Admin.News p. 2603.

In the Senate debate over whether a provision ought to be made to pay counsel of prevailing parties in lawsuits affecting secondary and elementary education,[5] Senators Mondale and Cook articulated the need which attorney fee awards would fill:

"There have been allegations by the National Education Association that several thousand black teachers have been fired in the South, or demoted. I would like to see lawsuits brought on that. There has been testimony that some schools have taken public property and given it away to segregated private academies. I would like to see some lawsuits on that . . . . Unfortunately they have not been forthcoming." 117 Cong.Rec. 10,762 (Senator Mondale)

---

**4.** It is true that the effect of textbook aid to segregated private schools on the desegregation process in the public sector is problematical. Even at this late date, the Supreme Court's admission rings true:

"We cannot and do not know, on this record at least, whether state textbook assistance is the determinative factor in the enrollment of any students in any of the private schools in Mississippi." *Norwood v. Harrison,* supra, 413 U.S. at 465, 93 S.Ct. at 2811, 37 L.Ed.2d at 731.

**5.** After hearings by the Senate Select Committee on Equal Educational Opportunity on the progress of desegregation in public education, Senator Mondale, as chairman, sponsored a bill which would have created a $15 million congressional fund out of which prevailing at-

torneys would be paid. This provision was defeated by the full Senate, which then approved the alternate method provided by § 718 for attorney fee awards in these cases. Although the quoted remarks by Senator Mondale were delivered in support of the unsuccessful $15 million fund proposal, they clearly apply with equal force to § 718, which simply shifted attorney fee responsibility from the United States to the defaulting defendants.

"The difference between this amendment today [§ 718] and Section XI originally in the bill, which was defeated yesterday, was the very issue of assessing attorneys' fees and costs at the discretion of the court against the defendant, and not against the Federal Government." 117 Cong.Rec. 11,521 (1971) (remarks by Senator Cook).

"[T]he transfer of public school property to segregation academies . . . in my opinion, clearly violate[s] the proscription of the 14th Amendment. 117 Cong.Rec. 11,339 (Senator Mondale) What this bill does, in essence, is that it says a party is entitled to pursue his remedy [of an attorney's fee] if there is a violation of . . . the 14th Amendment to the Constitution of the United States." 117 Cong.Rec. 11,725–26 (Senator Cook)

Thus, although the legislative history [6] is somewhat meager, it does tend to affirm that in enacting § 718 as a component of the Emergency School Aid Act, Congress was concerned with the impact of private, segregated academies on the public school desegregation process, and with the attempted diversion of state resources to support such private institutions.[7]

■ Finally, at least two district courts have held, as we do, that § 718 applies to a wider range of cases than straight-line school desegregation ac-

tions. In *Aspira of New York, Inc. v. Board of Education of City of New York,* 65 F.R.D. 541 (S.D.N.Y.1975), the plaintiffs sought and won bilingual classroom instruction in the New York City schools on behalf of a class of Spanish-speaking Puerto Rican citizens as to whom English language instruction was discriminatory. The court allowed plaintiffs' application for an attorney fee award under § 718, even though the case was a far cry from a school desegregation suit.

"It is urged, for one thing, that § 718 applies only to school desegregation cases. This is at odds with the statute's plain language, which we are permitted to consult. This is, tracking the words of § 718, an action 'for discrimination on the basis of * * * national origin in violation of title VI of the Civil Rights Act of 1964 * *.' *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The word 'discrimination' is obviously broader than 'segregation'. There is not the slightest justification for narrowing it

---

**6.** Although "[s]tatements by individual members of the legislature as to the meaning of provisions in a bill subsequently enacted into law, made during the general debate on the bill on the floor of each legislative house following its presentation by a standing committee, are generally held not to be admissible as aids in construing the statute . . . [t]his rule has been modified to permit consideration of explanatory statements by the sponsor of a bill, or by the member of the standing committee who is in charge of its presentation to the legislative house and leads the debate thereon. . . . Statements made by individual legislators during floor debates are also considered, along with information about contemporary conditions and events, when they tend to establish what problems or evils the legislature was undertaking to remedy by the statute being construed." 2A Sands, Statutes and Statutory Construction § 48.13 at 216–17 (4th ed. 1973).

**7.** Events accompanying public school desegregation in Mississippi furnish concrete support for this congressional concern and provide evidence for the intended purpose of § 718 to reach state activity of the sort present here. We cannot blink the historical fact that in a number of instances, public school property found its way into the hands of private segre-

gated schools during unitization of Mississippi school districts. See, e. g., *United States v. State of Mississippi,* 499 F.2d 425 (5 Cir. 1974) (en banc) (sublease of public school facility to private segregated school); *McNeal v. Tate County School District,* 460 F.2d 568 (5 Cir. 1972) (public school facility sold to segregated academy); *United States v. Tunica County School District,* 323 F.Supp. 1019 (N.D.Miss.), aff'd, 440 F.2d 377 (5 Cir. 1970) (payment of one semester's salary in advance to white public schoolteachers withdrawing to segregated academies immediately upon entry of public school desegregation order, and transfer of state-owned textbooks to white students enrolling in segregated schools which sprang up overnight); *Coffey v. State Educational Finance Commission,* 296 F.Supp. 1389 (S.D. Miss.1969) (three-judge court) (statute providing for payment of state tuition grants to children attending private, non-sectarian schools). Nor was this phenomenon restricted to Mississippi. *Gilmore v. Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *Wright v. City of Brighton,* 441 F.2d 447 (5 Cir. 1971). *Poindexter v. Louisiana Fin. Assistance Com'n,* 296 F.Supp. 686 (E.D.La.) (three-judge court), aff'd mem., 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968); *Brown v. South Carolina State Bd. of Educ.,* 296 F.Supp. 199 (D.S.C. 1968) (three-judge court).

as defendants propose." 65 F.R.D. at 543.

More persuasively, in *Brumfield v. Dodd*, 405 F.Supp. 338 (E.D.La.1975) (three-judge court), a case legally indistinguishable from ours, plaintiffs sued to enjoin defendant state officials from furnishing textbooks, library books, school supplies, educational materials and bus transportation to students attending segregated private schools. The three-judge court, Judges Wisdom, Heebe and Gordon, struck the offending Louisiana statute and enjoined further aid, citing *Norwood v. Harrison*. The court then allowed plaintiffs an attorneys' fee under § 718, without extended discussion.

■ From our reading of the literal terms of the statute and its legislative history, and following the lead of *Aspira* and *Brumfield*, we hold that this is a proper case for application of § 718, and an attorney fee award can be made under the statute in the court's discretion.

■ Our discretion in this regard is limited by *Northcross v. Board of Education*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48, 51 (1973), which held that "if other requirements of § 718 are satisfied, the successful plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Our examination of the record does not disclose any special circumstances of the kind described in *Northcross*. We so hold despite defendants' protestations that they should not be here taxed with a fee award because they did not know that state textbook aid to segregated schools was unconstitutional until the Supreme Court said so. We find nowhere that Congress intended the application of § 718 to turn on the defendants' intent or purpose. Good faith does not remove a case from its scope. It is conceded

that plaintiffs did not, in one stroke, obtain a blanket injunction against textbook aid to *all* private schools in Mississippi, segregated and otherwise, though that was originally prayed for. But the clear gravamen of plaintiffs' complaint was directed to the numerous all-white segregated schools created in the wake of public school desegregation mandated by the federal courts of Mississippi. As to these institutions plaintiffs' requested injunctive relief was, for all practical purposes, granted in its entirety.[8] Thus, plaintiffs are clearly the prevailing party, and we exercise our discretion to allow them a reasonable attorneys' fee as part of the costs in this action.[9]

### The Amount of the Fee

■ We need now to determine what constitutes a reasonable attorneys' fee for professional services rendered from the commencement of this case in 1970 to our July 12, 1974, judgment and order. Plaintiffs' counsel have supplied the court with affidavits itemizing elements of work and time expended in the case, requesting total compensation of $31,379; of this sum, $2,400 is claimed by James M. Nabrit, III, for work performed before the Supreme Court, and $28,979 by Melvyn R. Leventhal, trial counsel, for his services throughout the case. Although we granted defendants an opportunity to submit counter-affidavits or otherwise contest the reasonableness of the fees claimed, no challenge has in fact been interposed. Even so, it is our duty to undertake an independent examination of the reasonableness of plaintiffs' request, considering our familiarity with the evidence and the nature of the case, and by utilizing our expertise as a trial judge in determining the worth of counsel's services. In making our determination, we are mindful of the

---

8. See also note 3, supra, for a brief summary of the relief won by plaintiffs on the merits.

9. Although § 718 became law only on July 1, 1972, while the action was commenced two years earlier, this case was in active pendency on the date of § 718's enactment. Therefore,

we are empowered by *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), to allow an award for all legal services performed by plaintiffs' counsel since the beginning of this action, and not merely for those rendered since passage of § 718.

pertinent factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5 Cir. 1974).

As to the services rendered by Mr. Leventhal, several distinctive elements may properly be taken into account. First, it is significant that much of his service was rendered in the 1970–71 period of this litigation—prior to the substantial inflationary trend and at a time when prevailing fee rates among Mississippi practitioners were less than current charges.

Also, we note that at the outset of this case, Mr. Leventhal, though not a veteran at the bar, nevertheless had achieved expertise in civil rights litigation, having experienced a solid record of victories in hard-fought civil rights actions in Mississippi. The case sub judice was, by any standard, one of difficulty, involving delicate concepts of constitutional law in the interaction of the Fourteenth Amendment and a statewide benevolent program of assisting school children.

Although the case was, to say the least, quite unpopular with the white citizenry of Mississippi, it seems unlikely that Leventhal's participation in the suit either cost him other clients or precluded other remunerative employment. Instead, his prestige as a successful advocate in the civil rights field was, in no small measure, enhanced by the successful outcome of this action.

■ At all stages in the district court, Mr. Leventhal was lead counsel for plaintiffs and acted in accordance with the best traditions of the legal profession. His legal representation was, without question, of the highest calibre, exhibiting thoroughness and skill in factual development as well as legal argument. These efforts produced a signal victory from a unanimous Supreme Court. Considering these factors, we fix Leventhal's fee at $22,102. We believe a reasonable fee for Mr. Nabrit's services in the Supreme Court appeal to be $1,750.[10]

Finally, we should perhaps consider the question of against whom the attorneys' fee and cost award ought to be assessed. The nominal defendants—the members and executive secretary of the Mississippi State Textbook Purchasing Board (Board)—are obvious candidates to bear the loss, but in our opinion it would be grossly inequitable to impose a personal liability on them. This inequity becomes quite apparent upon an exami-

---

10. For that period of the litigation conducted in the district court before appeal to the Supreme Court, Leventhal itemizes 406.85 hours of legal service at $35 per hour. We disallow the 37 hours assigned for travel to depositions. With respect to the remaining hours, we must reduce counsel's claimed rate for some items, simply because of the nature of some of the work rendered. For that time claimed for writing letters, participating in conferences, filing routine motions, preparing exhibits and the like (116.35 hours), we believe a reasonable fee under all the circumstances would be $20 per hour. For the 101.5 hours assigned to depositions, $30 per hour seems reasonable. For the remaining 152 hours, which were spent in drafting the complaint, legal research, brief-writing, and courtroom appearances, the full $35 per hour should be allowed.

After the case was remanded to the district court, Leventhal worked diligently to develop the certification procedure mandated by the Supreme Court, and to ascertain the eligibility vel non of each of the private schools seeking continuing textbook aid. The value of these contributions to the court and to his clients cannot be overstated. His 141.5 claimed hours for this period are fully deserved and will be remunerated at $40 per hour.

In the Supreme Court, both Leventhal and Nabrit claim significant amounts of time, at $50 per hour, which total 231 hours spent in prosecuting the appeal. While $50 per hour is clearly not unreasonable for advocacy before the Supreme Court of the United States, we cannot believe that all the time spent in preparation there was reasonably necessary. Consequently, we reduce Nabrit's claimed hours from 48 to 35, and Leventhal's from 183 to 115. This reduction reflects our opinion of the amount of time necessary to properly prepare this case for appellate review.

Our final award to plaintiffs' counsel, then is as follows:

Leventhal

| | | |
|---|---|---|
| 116.35 hours x $20 = | | $2,327 |
| 101.50 hours x $30 = | | 3,045 |
| 152.00 hours x $35 = | | 5,320 |
| 141.50 hours x $40 = | | 5,660 |
| 115.00 hours x $50 = | | 5,750 |
| | | $22,102 |

Nabrit

| | | |
|---|---|---|
| 35 hours x $50 = | | $1,750 |

nation of applicable state law relating to the distribution of state-owned textbooks.

The five-person Board, under state law, consists of the governor and the state superintendent of education, who serve without pay; and three professional educators appointed by the governor, who receive only nominal compensation. Miss.Code Ann. § 6634, 6639 (1942). The executive secretary, an appointee of the Board, is an administrative officer, without policy-making powers and carries out only such ministerial duties as may be specified by the Board. Miss.Code Ann. § 6634 (1942).

It must be emphasized that all individual defendants, the Board members as well as the executive secretary, acted pursuant to the mandate of state law. Miss.Code Ann. § 6656 (1942) commanded:

"The books herein provided by the state textbook purchasing board *shall* be distributed and loaned free of cost to the children of the free public schools of the state and of *all other schools located in the state, which maintained educational standards equivalent to the standards established by the state department of education for the state schools.*" (Emphasis added)

▮ This statutory imperative removed any room for the exercise of discretion by the defendants, for all schools within the state meeting the educational standards prescribed by the State Board of Education—standards over which the defendants had no control—were required to be supplied books for the benefit of their students. Thus, in order for the individual defendants to have con-

formed to Fourteenth Amendment standards, they would have been required to radically depart from the clear words of the statute. Of course, while contrary state law cannot permit state officials to trample federal requirements, the long-unchallenged existence of this state arrangement regarding supplying all children with free state textbooks, when questioned in a case of first impression, clearly provides "special circumstances" which would render inequitable the assessment of an award against these individuals in their personal capacities.[11] The realities of this case, it must be said, impel a conclusion that the Board members, when the lawsuit assailed their conduct, were simply carrying on a state practice which had been popularly accepted for almost 30 years.

Although this action, first begun under the aegis of 42 U.S.C. § 1983, was not maintainable against the Board as a state agency, since it was not a "person" within the meaning of the statute,[12] the continuation of the unconstitutional practice of extending state textbooks to segregated academies is a reflection of deliberate state policy, undertaken despite the strictures of the Fourteenth Amendment. It was so treated by the Supreme Court in its unanimous opinion on the merits, and no good reason exists to change the cast of this action at this late date. Section 718 is aimed at racial discrimination practiced in the state's name, and the fact that the century-old language of § 1983 limits its effect to a "person" is what can only be regarded as a fiction which Congress unmistakably chose to abandon in the enactment of § 718 as a specific remedy to achieve Fourteenth Amendment compliance in

---

**11.** This result dictates that, if we are mistaken in our Eleventh Amendment analysis, we would refrain from any imposition of personal liability against the individual defendants, convinced as we are that, under *Northcross,* supra, recovery from them should not be had under § 718, because of unique circumstances. Our conclusion that no award would be proper against the individual defendants in this action under § 718 also pretermits any problems

posed by *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and the immunity possessed by public officials.

**12.** See *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Cason v. City of Jacksonville,* 497 F.2d 949 (5th Cir. 1974); *Weathers v. West Yuma County School District R–J–1,* 387 F.Supp. 552 (D.Colo.1974).

144

the field of elementary and secondary education. We therefore, as § 718 requires, place liability on the Mississippi State Textbook Purchasing Board as a state agency, in its official capacity, for the amount of the attorney's fees and costs herein adjudged to be owing.

An order will be entered accordingly.